UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | No. 08 CR 192 |
| | ) | |
| HANJUAN JIN | ) | Hon. Ruben Castillo |

**GOVERNMENT'S CONSOLIDATED *MOTIONS IN LIMINE* SEEKING A PRE-TRIAL
RULING ON THE ADMISSION AND EXCLUSION OF CERTAIN EVIDENCE**

PATRICK J. FITZGERALD
United States Attorney

By:  /s/Sharon R. Fairley
STEVEN J. DOLLEAR
SHARON R. FAIRLEY
CHRISTOPHER J. STETLER
Assistant U.S. Attorneys
219 South Dearborn Street, 5th Floor
Chicago, Illinois 60604
(312) 353-3500

# TABLE OF CONTENTS

I.      INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

II.     FACTUAL BACKGROUND . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

III.    MOTION TO ADMIT EVIDENCE OF MONEY TRANSFER . . . . . . . . . . . . . . . . 6

        A.      March 5, 2007 Money Transfer to China . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

        B.      Applicable Law . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

        C.      Argument . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

IV.     MOTION TO ADMIT EVIDENCE OF JIN'S MISREPRESENTATIONS
        TO CBP . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

        A.      JIN's Misrepresentations to CBP about Currency She Was Carrying . . . . . . . . . 9

        B.      JIN's Misrepresentations to CBP are Evidence of the Charged Conduct . . . . . . 10

        C.      Alternatively, JIN's Misrepresentations to CBP are Admissible Pursuant to Rule
                404(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

V.      MOTION TO ADMIT EVIDENCE OF MATCHING COMPANY A AND SUN
        KAISENS DIAGRAMS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

        A.      The Matching Diagrams . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

        B.      Evidence of the Matching Diagrams is Probative of Jin's Knowledge of and Intent
                to Benefit Herself, Sun Kaisens, and the Chinese Government . . . . . . . . . . . . . 16

        C.      Alternatively, Evidence of the Matching Diagrams is Admissible
                Under 404(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

VI.     MOTION TO EXCLUDE CERTAIN EVIDENCE FROM TRIAL . . . . . . . . . . . . 19

        A.      Evidence for which a Pre-trial Ruling of Exclusion is Sought . . . . . . . . . . . . . 19

        B.      Applicable Law . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

        C.      Argument . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

**TABLE OF CONTENTS (cont.)**

**VII.  CONCLUSION** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

## <u>TABLE OF AUTHORITIES</u>

### <u>CASES</u>

*Computer Associates Intern. v. Quest Software, Inc.*, 333 F.Supp.2d 688 (N.D. Ill. 2004) . . . . 21

*Matter of Innovative Const. Systems, Inc.*, 793 F.2d 875 (7th Cir.1986) . . . . . . . . . . . . . . . . . 22

*Tax Track Systems Corp. v. New Investor World, Inc.*, 478 F.3d 783 (7th Cir. 2007) . . . . . . . 22

*United States v. Burke*, 425 F.3d 400 (7th Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*United States v. Canady*, 578 F.3d 665 (7th Cir. 2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12, 13

*United States v. Chung*, 2011 WL 4436271 (9th Cir. Sept. 26, 2011) . . . . . . . . . . . . . . . . . . . 21

*United States v. Conner*, 583 F.3d 1011 (7th Cir. 2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . 12, 13

*United States v. Cox*, 577 F.3d 833 (7th Cir. 2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*United States v. Edwards*, 581 F.3d 604 (7th Cir. 2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*United States v. Ellis*, 548 F.3d 539 (7th Cir. 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*United States v. Harris*, 542 F.2d 1283 (7th Cir.1976) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*United States v. Jackson*, 572 F.2d 636 (7th Cir.1978) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

*United States v. Lange*, 312 F.3d 263 (7th Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*United States v. Levine*, 5 F.3d 1100 (7th Cir.1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

*United States v. Payne*, 635 F.2d 643 (7th Cir. 1980) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*United States v. Ross*, 510 F.3d 702 (7th Cir. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11, 17

*United States v. Skoczen*, 405 F.3d 537 (7th Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

*United States v. Solomon*, 688 F.2d 1171 (7th Cir.1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

*United States v. Taylor*, 522 F.3d 731 (7th Cir. 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12, 13

*United States v. Vasquez*, 635 F.3d 889 (7th Cir. 2011) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

**<u>TABLE OF AUTHORITIES</u>** (cont.)

**<u>STATUTES</u>**

18 U.S.C. § 1839 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

**<u>RULES</u>**

Fed. Rule of Evid. 401 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10, 16

Fed. Rule of Evid. 402 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

Fed. Rule of Evid. 403 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

Fed. Rule of Evid. 404(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11-14, 17, 23

Fed. Rule of Evid. 407 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

## I.  __INTRODUCTION__

The United States of America, by its attorney, Patrick J. Fitzgerald, United States Attorney for the Northern District of Illinois, respectfully submits these consolidated *motions in limine* seeking a pre-trial ruling on the admission and exclusion of certain evidence and states as follows:

The government seeks to admit evidence of flight, namely, the March 5, 2007 transfer of a large sum of money to China, to show JIN's consciousness of guilt of the charged offenses.   The government also seeks to admit evidence of a misrepresentation JIN made to an officer of the United States Customs and Border Protection ("CBP") regarding the amount of currency she was carrying when attempting to travel to China.  This evidence is admissible to show JIN's knowledge of and intent to commit the charged crimes.  The government seeks to admit evidence of documents containing similar technical diagrams JIN's intent.  Lastly, the government seeks to exclude evidence or argument by the defendant regarding misconduct committed by other Company A employees related to the protection of Company A's trade secrets because such evidence lacks probative value to the issues in the case.

## II.  __FACTUAL BACKGROUND__

### A.  __JIN's Initial Employment With Company A__

Starting in or around 1998, defendant Hanjuan Jin ("JIN") worked as a software engineer for Company A, a Chicago-based, global telecommunications company.   In connection with her employment, JIN received regular training regarding the protection of proprietary information belonging to Company A.

In or about February 2006 through approximately February 2007, JIN took a medical leave of absence from Company A, during which time she received no work assignments from Company

- 1 -

A.

**B.     JIN's Work For Sun Kaisens**

From in or about June 2006, until in or about December 2006, while on sick leave from Company A, defendant JIN discussed, negotiated and planned to accept employment in China with Sun Kaisens, a telecommunications company based in China.  Evidence at trial will show that, in late 2006, JIN performed work for Sun Kaisens, and, at that time, the company was involved in the development of telecommunications technology and products for the Chinese military.  The evidence will show that JIN consulted with Sun Kaisens representatives on projects involving work being done by the company for the Chinese military.

Law enforcement also recovered Chinese language emails from JIN's personal laptop seized at the airport in Chicago on February 28, 2007, between JIN and a Chief Qi, who works for Sun Kaisens during which JIN and Qi discussed JIN's future employment with Sun Kaisens in China including details about her salary and possible start date.

**C.     JIN's Return to Company A In February 2007**

On February 23, 2007, just over one week following a return from a trip to China, JIN advised Company A that she was ready to end her medical leave and return to full-time work with Company A.  JIN did not advise Company A that she had planned to accept employment with Sun Kaisens.

On February 24, 2007, defendant JIN purchased a one-way ticket to China for a flight scheduled to leave on February 28, 2007.   On the morning of February 26, 2007, defendant JIN returned to Company A, purportedly to resume full-time work. JIN was given no assignments on that day.  Between approximately 9:00 a.m. and 2:00 p.m. that day, defendant JIN downloaded over 200

technical documents belonging to Company A from Company A's secure internal computer network.

Later, at approximately 9:00 p.m. that night, JIN returned to her Company A office building and downloaded technical documents belonging to Company A from Company A's secure internal computer network, and removed numerous documents and other materials from the offices of Company A.

On February 27, 2007, at approximately 12:15 p.m., JIN informed her manager at Company A by email that she was resigning from Company A. Later that same day, at approximately 3 p.m., a withdrawal of $20,000 was made from JIN's bank account.[1] That same night, at approximately 10:00 p.m., JIN returned to her Company A office building and downloaded numerous technical documents belonging to Company A from Company A's secure internal computer network.

### D.     JIN Stopped At the Airport

On February 28, 2007, at approximately 12:00 p.m., JIN traveled to O'Hare International Airport in Chicago, Illinois, for the purpose of departing to China. During a search of her purse and other carry-on items, CBP agents found JIN had over $30,000 in United States Currency, several documents apparently belonging to Company A labeled as proprietary and confidential, several Chinese military documents related to telecommunications technology, and various items of electronic media. A further search showed the electronic media JIN carried contained over 1,000 documents belonging to Company A containing technical information related to telecommunications technology. Many of these documents contained valuable confidential and proprietary information

---

[1]As will be further described below, on or about March 5, 2007, $115,000 was transferred from this same account to a bank account in China.

belonging to Company A including three specific documents the evidence will show are trade secrets of Company A.

In addition to having documents belonging to Company A in her possession, agents found that JIN possessed documents related to Sun Kaisens's work for the PRC military as well as documents authored by organizations within the PRC military.

On March 1, 2007, JIN returned to the Chicago O'Hare airport and attempted to board another flight to China. Again, JIN was stopped by CBP agents. Later that day, JIN consented to a search of her residence. During the search, agents recovered additional documents belonging to Company A.

**E.      Jin's Statements to Law Enforcement**

     **1.      February 28, 2007**

Shortly after Jin was stopped at O'Hare Airport on February 28, 2007, she was interviewed by law enforcement. Jin stated she took sick leave from Company A in May 2006 and traveled to China from November 2006 to February 2007. JIN told law enforcement that she planned to travel to China for an undetermined length of time.

Jin was asked about the Company A documents found in her possession at the airport and she stated that she was taking the documents to China in order for her to study. She stated further that she had been off work for such a long time, she wanted to read the documents and refresh her knowledge.

Agents then asked Jin about certain documents marked as "Classified" dealing with the Chinese military found in her laptop computer case. Initially, Jin stated that she downloaded these documents from the internet, but later admitted that she was given the documents by Genghan Liu,

- 4 -

who, she explained, was a computer software engineer that lives and works in China. Jin stated that Liu worked for or owned a company in China. Jin stated that she first met Liu in 2004 and has most recently met with Liu in Beijing in November 2006.

### 2.     March 1, 2007 Interview

The next day, on March 1, 2007, Jin was stopped again at O'Hare Airport and questioned as she attempted to board a flight for China. Jin was again questioned about the Company A documents recovered the day before and Jin stated that she was taking these documents to China in order to refresh her memory on this material and to study. Jin also stated that because she was on medical leave for the last year, she wanted to read this material in order to prepare herself for her next job.[2]

Jin was then asked about certain documents she possessed that were connected to the Chinese government. Jin stated that she was asked by Liu to review the documents in order to determine if she could assist with the related projects. Jin stated that Liu gave her these documents in November 2006. When asked about a Sun Kaisens document, Jin stated that the document was created by a privately-owned Chinese company called Sun Kaisens. Jin stated that Sun Kaisens is only located in Beijing, China, and focuses on computers, telecommunications and information technology. Jin stated that one particular document she was asked about was given to her in December 2006 by a an engineer working for Sun Kaisens. Jin noted that her name was listed in

---

[2]As explained below, defendant had been negotiating employment via email with "Chief Qi" at Sun Kaisens in China and defendant anticipated being offered a job with Sun Kaisens when she arrived in China. Also, based on a Sun Kaisens company directory and email lists recovered from Jin on February 28, 2007, Liu and "Chief Qi" (Shiqing Qi) worked for Sun Kaisens. The email address listed on the company directory matches that used by Qi to communicate with defendant at her Yahoo! email address.

this document as a project chief director, but she stated that she was a director of guidance for this particular project. Jin stated that she had provided guidance on similar projects for Sun Kaisens in the past. Jin further stated that she had provided oral guidance on this document to people at Sun Kaisens and was later given a copy of the document.

### 3. March 2, 2007 Interview

On March 2, 2007, Jin was interviewed again and stated that she was introduced to Gengshan Liu at the end of April 2005 in Beijing, China. Jin met Liu for a second time in November 2005 and during this meeting, Liu gave Jin his phone number and instructed her to use the number while she was in China so that they could arrange meetings. Jin stated this second meeting was like an interview and that she discussed her areas of expertise, technical knowledge, overall work experience, and her work in software development. Jin stated that the conversation was focused on technical details.

Jin stated that, between November 2006 and February 2007, a third meeting took place in Beijing, China. At this time, Jin stated that Liu gave Jin the documents connected to the Chinese government. Jin stated that Liu requested that Jin review the documents in order to determine the amount of assistance she would be able to provide on this project. Jin stated that the outcome of her work with this project could result in a job for her at Sun Kaisens. Jin stated that she planned to meet with Liu when she returned to China on February 28, 2007. Jin also stated that on this return trip she expected to be offered employment at Sun Kaisens.

## III.   MOTION TO ADMIT EVIDENCE OF MONEY TRANSFER

### A.   March 5, 2007 Money Transfer to China

As outlined above, on February 28, 2007, JIN attempted to leave the United States with a

wealth of valuable, proprietary information belonging to her former employer, but was stopped by law enforcement. The very next day, on March 1, 2007, JIN again attempted to leave the United States for China yet again. That day, she arrived at O'Hare International Airport with a one-way ticket on a flight to Beijing, China that she had reserved the day before. JIN again attempted to board the plane. Once in the jetway, JIN was again approached by a CBP officer, and ultimately agreed to be interviewed by the FBI and did not get on the flight to China.

Merely five days after she was first stopped, and only three days after her last interview with the FBI, on March 5, 2007, $115,000 was transferred to a Chinese bank from a money market savings account JIN held jointly with her husband at Chase bank. This amount represented the bulk of the funds in this savings account, as the balance in the account as of February 28, 2007 was $122,088. According to Chase records, the money was transferred to the China Merchants Bank in China.[3]

The government intends to elicit testimony and present bank records related to the money transfer as evidence of JIN's intent to commit the charged conduct.

## B. <u>Applicable Law</u>

Evidence of flight may be admissible to show consciousness of guilt, as well as guilt itself. *United States v. Solomon*, 688 F.2d 1171, 1176 (7th Cir.1982); *United States v. Jackson*, 572 F.2d 636, 639 (7th Cir.1978). The probative value of flight as circumstantial evidence of guilt depends upon the degree of confidence with which four inferences can be drawn: (1) from the defendant's behavior to flight; (2) from flight to consciousness of guilt; (3) from consciousness of guilt to consciousness of guilt concerning the crime charged; and (4) from consciousness of guilt concerning

---

[3] China Merchants Bank has no presence in the United States.

the crime charged to actual guilt of the crime charged. *United States v. Skoczen*, 405 F.3d 537, 548 (7th Cir. 2005) (citing *United States v. Levine*, 5 F.3d 1100, 1107 (7th Cir.1993)).

C.   **Argument**

There is ample evidence to support the inference that JIN transferred money because she intended to flee to China as soon as possible because she knew she was guilty of the charged conduct. JIN attempted to leave the United States for China the very next day after CBP agents found: (1) that she lied on her money declaration form; (2) that she possessed hundreds of Company A confidential and proprietary documents; (3) and that she also possessed various Chinese military-related documents. The temporal proximity between when JIN was first stopped at O'Hare airport and when funds were transferred is so close that it is appropriate to infer that the transfer of the money was, in fact, part of her plan to flee to avoid prosecution. From all of these facts, it is reasonable to infer that JIN transferred a large sum of money – in fact, the bulk of her and her husband's joint savings account – to China, and that JIN was attempting to flee to China before she could be arrested for the crimes she knew she had committed.

Regarding the third and fourth prongs outlined above, it is reasonable to infer from the money transfer that JIN knew that she was guilty of possessing trade secrets and that she was, in fact, guilty of the possession of trade secrets. JIN knew she had hundreds of Company A's documents in her possession when the CBP agents stopped her and searched her bags. JIN knew she had downloaded hundreds of documents herself from Company A's computer system and also removed paper documents from Company A's offices merely the day before her first airport encounter. It is also likely that JIN knew that Company A would have records of the documents she had downloaded and would eventually become aware of the extent of the materials she took from

the company in violation of Company A's policies. JIN also knew that CBP had made copies of the Chinese military documents she had in her possession on February 28, 2007. JIN knew that law enforcement was likely to soon figure out that her possession of the Chinese military documents was connected to her possession of Company A documents. For these reasons, she clearly planned to flee to China to avoid punishment for her misappropriation of the trade secrets and the money transfer was a part of her plan.

## IV.     MOTION TO ADMIT EVIDENCE OF JIN's MISREPRESENTATIONS TO CBP

### A.     JIN's Misrepresentations to CBP about the Currency She Was Carrying

On February 28, 2007, as JIN walked down the jet-way toward the aircraft bound for China, a CBP agent approached JIN pursuant to a routine, random outbound inspection of departing international passengers. The agent introduced himself to JIN and explained the nature of the inspection. He requested her travel documents, and she complied. After explaining the currency reporting requirements to JIN, the agent inquired about how much currency she had. JIN responded that she had $10,000 United States dollars. The agent next provided JIN with a United States Customs declaration form (the "Form 503").[4] The agent observed as JIN read the form, then he asked her if she understood it, to which she replied that she did. In the section of the form where the passenger is to indicate how much currency she is declaring, JIN wrote "$10,000," then drew a line threw that number, and printed "11,000," followed by her initials. JIN signed the Form 503 at the bottom.

After JIN gave the agent the completed Form 503, the agent gave her another customs form

---

[4]  This form is referred to as the "Form 503." The agent offered JIN the choice of either an English version or a Chinese version of the Form 503, and she chose the Chinese version.

written in English titled, "Report of International Transportation of Currency or Monetary Instruments" (the "FinCen Form"). The agent asked JIN to complete this form. On this form, JIN again declared that she had $11,000 in currency. JIN also signed and dated this form. Just above the signature line, the form includes the following declaration: "[u]nder penalties of perjury, I declare that I have examined this report, and to the best of my knowledge and belief, it is true, correct and complete." After JIN completed the FinCen form, the agent requested that JIN show him the currency she had. The agent observed JIN remove two envelopes from a laptop bag she was carrying, each of which contained $5,000. Then JIN removed additional cash from her purse, which totaled approximately $1,252. When asked if this was all the currency she was carrying, JIN replied that it was. The agent then inquired about her carry-on items, and JIN confirmed that three items belonged to her: her purse, a black laptop bag, and a carry-on bag. The agent then advised JIN that he was going to search these items. The agent first searched the area of the laptop bag from which JIN had earlier retrieved the two envelopes containing cash. The agent found four additional similar envelopes, each containing $5,000 in United States Currency. In total, JIN was found to have approximately $31,252 in cash in her possession. Evidence that JIN misrepresented the amount of money she was carrying is admissible to show her preparation, plan, and intent to commit the charged crimes.

**B.**     <u>JIN's Misrepresentations to CBP are Admissible As Evidence of The Charged Conduct</u>.

       1.     **Applicable Law**

Federal Rule of Evidence 401 provides that relevant evidence is evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence. Here, evidence of JIN's

misrepresentations to CBP are relevant to show JIN possessed the trade secret documents she was carrying without authorization and with the intent to benefit someone other than the owner of the trade secrets.

> 2. **Argument**

JIN's misrepresentations to CBP about the amount of cash she was carrying is admissible as evidence of her intent to commit the charged conduct. At the time she was stopped by CBP, JIN knew she was carrying thousands of confidential proprietary documents belonging to Company A. As she acknowledged in her statements to law enforcement, JIN had taken these documents to benefit herself. As outlined above, she had taken the documents so that she could refresh her memory in preparation for her new job. The evidence shows that she intended to accept employment at Sun Kaisens in China. Therefore, in order for her to derive the benefit she needed from the documents, she needed to take them with her to China. Recognizing that she needed to successfully transport the Company A documents to China in order to derive benefit from them, she lied to CBP about the cash she was carrying so as to avoid the additional scrutiny she might receive had she admitted to the more than $30,000 of cash she was transporting.

### C.  Alternatively, JIN's Misrepresentations to CBP Are Admissible Pursuant to Rule 404(b).

> 1. **Applicable Law**

Federal Rule of Evidence 404(b) permits evidence of other crimes, wrongs, or acts to be admitted to establish proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident. *See* FRE 404(b); *United States v. Ross*, 510 F.3d 702, 713 (7th Cir. 2007). Admissibility under 404(b) is governed by a four-part test: (1) the evidence must relate to a matter other than the propensity to commit the charged offense; (2) the evidence must be similar

enough and close enough in time to a matter in issue; (3) there must be sufficient evidence that the

other acts were committed; and (4) the probative value of the evidence must not be substantially

outweighed by any unfair prejudice. *United States v. Burke*, 425 F.3d 400, 410 (7th Cir. 2005).

Rule 404(b) provides a non-exhaustive list of purposes for which evidence of other crimes

is admissible:

> Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person
> in order to show action in conformity therewith. It may, however, be admissible for other
> purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge,
> identity, or absence of mistake or accident . . . .

Fed. R. Evid. 404(b). The Seventh Circuit has repeatedly instructed that, under Rule 404(b),

evidence of other bad acts is admissible so long as the evidence is not introduced to show the

defendant's bad character. *United States v. Taylor*, 522 F.3d 731, 734-36 (7th Cir. 2008) (among

other examples, prior drug sales admissible to explain coded term); *United States v. Conner*, 583

F.3d 1011, 1021-22 (7th Cir. 2009) (prior drug sales admissible to show intent); *United States v.

Edwards*, 581 F.3d 604, 609 (7th Cir. 2009) (prior drug sales admissible to show possession); *United

States v. Canady*, 578 F.3d 665, 671-72 (7th Cir. 2009) (prior criminal uses of firearm admissible

to show possession of the same firearm); *United States v. Cox*, 577 F.3d 833, 838-39 (7th Cir. 2009)

(credit card fraud used to rent hotel rooms admissible to show defendant could pay for prostitution

parties and to rebut defense that defendant was not wealthy); *United States v. Ellis*, 548 F.3d 539,

544 (7th Cir. 2008) (prior tax violations admissible to show wilfulness and to rebut forgetfulness

defense).

In explaining the scope of Rule 404(b), the Seventh Circuit has emphasized that Rule

404(b)'s purpose "is simply to keep from the jury evidence that the defendant is prone to commit

crimes or is otherwise a bad person . . . . No other use of prior crimes or other bad acts is forbidden

by the rule, and the draftsmen did not try to list every possible other use." *Taylor*, 522 F.3d at 735-36. Thus, Rule 404(b) permits evidence of other crimes to be introduced not only for the explicitly-listed purposes, but also for any other relevant purpose, such as "the need to avoid confusing the jury." *Id.* at 736. The examples provided above illustrate the breadth of the purposes for which the government may offer evidence under Rule 404(b).

Furthermore, although the Seventh Circuit has now criticized the "inextricably intertwined" doctrine as a basis for admitting evidence of other crimes, the Court has also held, at the same time, that "[a]lmost all evidence admissible under the 'inextricably interwoven' doctrine is admissible under one of the specific exceptions in Rule 404(b), or under the judge-made 'no confusion' exception . . . ." *Taylor*, 522 F.3d at 735; *Canady*, 578 F.3d at 672 ("almost all evidence that is admissible under this doctrine would fall within one of the exceptions in Rule 404(b), and this case is no different"). To be sure, rather than invoke a non-Rule based doctrine, applying Rule 404(b) has the virtue of focusing the analysis on non-propensity purposes and avoids the vice of the jury considering the other-crimes evidence without a proper limiting instruction. *Conner*, 583 F.3d at 1024. But evidence that would have been formerly admissible under the "inextricably intertwined" doctrine will almost always serve a non-propensity purpose and be admissible under Rule 404(b). That is the case here.

2. **Argument**

In addition to serving as direct evidence of the charged offenses, evidence that JIN misrepresented the amount of money she carried is also admissible under Rule 404(b). Regarding the first prong of the 404(b) analysis, the evidence of JIN's misrepresentation that she was carrying only $11,000, when in fact she was carrying over $30,000 in cash is not being presented to show that

- 13 -

JIN has a propensity to commit crimes. Rather, this fact is evidence of JIN's knowledge of and intent to commit the charged offenses – her successful possession of the trade secret documents for transportation to China where they could be used to the her benefit, the benefit of her proposed new employer Sun Kaisens, and the PRC. JIN did not declare the full amount of cash she had in her possession because, if she had, she believed that the CBP officers would have been more likely to subject her and her carry-on items to additional screening and search, and, therefore, they would have discovered the documents she carried. Evidence of these misrepresentations shows JIN's knowledge of her commission of the charged offenses. The misrepresentations show that JIN knew she was carrying confidential proprietary documents belonging to Company A that she was not authorized to be transporting to China and that she did not want CBP to find the documents. Moreover, the misrepresentations are evidence of JIN's intent to commit the charged offenses. More specifically, JIN needed to successfully transport the proprietary documents she knew she had to China in order for her, Sun Kaisens and the PRC to benefit from her possession of the documents. As a result, she understated the amount of cash she had to the CBP agent in an attempt to reduce the likelihood they would subject her and her luggage to additional screening.

Regarding the second prong of the test, JIN's misrepresentation is not only close in time to the charged conduct, it is at the exact same time as the charged possession. Moreover, there is sufficient evidence to support that the conduct occurred. At trial, the government will present testimony from the CBP agents who conducted the border patrol stop of JIN and who reviewed the paperwork associated with her travel. In addition, the government will present the two customs forms she completed and signed in which the misrepresentation was made. Lastly, the probative value of this evidence is not substantially outweighed by the potential prejudice. The

- 14 -

misrepresentation is an act of an entirely different kind than the charged conduct.   Therefore, it is unlikely it will not leave the jury with the impression that JIN was more likely to have committed the charged conduct.  In fact, most jurors are unlikely to consider JIN's misrepresentation as a serious violation of a criminal nature, therefore, the risk of potential prejudice is minimal.[5]

## V.      MOTION TO ADMIT EVIDENCE OF MATCHING COMPANY A AND SUN KAISENS DIAGRAMS

### A.      The Matching Diagrams

As explained above, at the time JIN was stopped at O'Hare on February 28, 2007, she was carrying a large volume of documents from Company A and Sun Kaisens, in electronic and hard copy format.  Among the Company A documents stored on JIN's Ion external hard drive, was A document titled in part: "[Company A] . . .  Product Description Version 0.8f" and dated Tuesday, June 22, 2004 [the "diagram document"].  Although not one of the charged trade secret documents, the diagram document  is identified on its cover as containing Company A confidential and proprietary information.  Notably this document was saved multiple times on JIN's  Ion hard drive.  On the top half of page17 of the diagram document is a detailed diagram of a Company A product.  To the immediate right of the diagram is a detailed description of the various components depicted in the diagram.  Within the description of the components, Company A is mentioned two times in connection with two different component parts.

The same diagram and its related description, absent the references to Company A, is

---

[5]  While this evidence is not unduly prejudicial the Court could further reduce any potential for prejudice by instructing the jury on the limited use of the evidence.  *See United States v. Vasquez*, 635 F.3d 889, 894 (7th Cir. 2011) ("limiting instructions are effective in reducing or minimizing any possible unfair prejudice from the introduction of Rule 404(b) evidence.")(internal quotations omitted).

depicted in in two different Sun Kaisens documents which were also found in JIN's possession as she was attempting to board her plane for China on February 28, 2007.

**B.**    **Evidence of the Matching Diagrams is Probative of Jin's Knowledge Of and Intent to Benefit Herself, Sun Kaisens and the Chinese Government.**

As explained above, Federal Rule of Evidence 401 provides that relevant evidence is evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence.

Here, evidence of the matching diagrams between specific Company A and Sun Kaisens documents is relevant to show that JIN possessed the charged trade secret with the intent to convert the trade secrets to the benefit of someone other than the owner of the trade secrets - namely, herself, Sun Kaisens and the Chinese government. More specifically, it shows that Sun Kaisens was interested in Company A information and had used and benefitted from Company A information on at least one occasion in the past. This same evidence is also probative to show that JIN intended or knew that the taking Company A trade secrets would injure Company A. In other words, this evidence shows that the taking of Company A documents related to more than just refreshing JIN's recollection, as she told law enforcement. Instead, this evidence makes is more likely that the stolen information was to be used by Sun Kaisens as part of its telecommunications business. Lastly, given the significant overlap between Sun Kaisens and the Chinese military, this evidence also demonstrates that JIN knew that the stolen Company A trade secrets were to be used for the benefit of Sun Kaisens' primary customer - the Chinese government.

**C.**    **Alternatively, Evidence of the Matching Diagrams Is Admissible Under 404(b).**

Alternatively, the same evidence of the matching diagrams is also admissible under Federal Rule of Evidence 404(b) which permits evidence of other crimes, wrongs, or acts to be admitted to

establish proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident. *See* FRE 404(b); *United States v. Ross*, 510 F.3d 702, 713 (7th Cir. 2007). Here, the evidence meets the four-part test for Rule 404(b) evidence described above.

First, the evidence relates to a matter other than propensity. Instead, in this instance, the evidence of the matching diagrams is probative of JIN's intent, knowledge, motive and absence of mistake related to the charged offenses. First, the matching diagrams demonstrate JIN's knowledge that Sun Kaisens was interested in using Company A technology and JIN's intent to convert the trade secrets to the benefit of herself, Sun Kaisens and the Chinese government. More specifically, the matching diagrams show that JIN was aware on February 28, 2007 that Sun Kaisens sought to benefit from Company A information. This evidence also directly refutes any mistake-type argument by JIN. For instance, the proffered evidence helps to contradict JIN's statements to law enforcement that she was merely taking the information to refresh her own knowledge and that she had no intent to harm Company A. Instead, this evidence shows that consistent with her wholesale taking of Company A information, JIN acted with a specific purpose- namely, to benefit herself, Sun Kaisens and the Chinese government.

Moreover, the evidence is also probative of JIN's motive to commit the crime of stealing trade secrets. As explained above, JIN had been negotiating employment with Sun Kaisens for months and expected to be offered a job when JIN returned to China in February 2007. As the proffered evidence shows, JIN also knew that Sun Kaisens was interested in Company A information and technology and wanted to better her employment prospects and negotiating position with Sun Kaisens. For instance, in one of the emails between JIN and Chief Qi in September 2006 related to her future employment , Chief Qi tells JIN: "You should share with us the fruit of our

collective effort." Accordingly, in addition to lining up employment with Sun Kaisens (which the evidence shows JIN vigorously sought), JIN also had a potential financial interest in helping Sun Kaisens prosper.

Regarding the second prong of the test related to temporal proximity , the documents with the matching diagrams were in JIN's possession on February 28, 2007 - the same day as the charged possession of the three trade secret documents. Moreover, there is sufficient evidence to demonstrate JIN's possession of the relevant Company A and Sun Kaisens documents. Similar to the charged trade secret documents, the government will show that both the Company A diagram document and the Sun Kaisens documents containing the matching diagram were recovered from electronic media recovered from JIN at the airport.

Lastly, the probative value of this evidence is not substantially outweighed by the potential prejudice. The probative value is significant and any potential prejudice minimal. First, the matching diagrams goes directly to explain JIN's fraudulent return to Company A and why she would steal hundreds of documents from Company A. Namely, this diagram if further circumstantial proof that JIN stole the trade secrets for the benefit of Sun Kaisens because Sun Kaisens was using Company A technology without Company A's authorization. The potential prejudice of this evidence is minimal. More specifically, the government's evidence, including JIN's own statements and the circumstances of her day and a half return to Company A from a year sick leave will point to the same conclusion - that JIN stole the trade secret to convert them to the benefit of someone other than Company A. The matching diagrams is just one more piece of evidence that points to this very same conclusion. The jury will hear also hear substantial evidence (including JIN's own statements to law enforcement) that JIN was working on Chinese miliary

telecommunications projects at Sun Kaisens while on sick leave from Company A. Moreover, the government's evidence. The fact that JIN's projects overlapped can be no more prejudicial than any other evidence showing connections between JIN and Sun Kaisens, which she was on sick leave from Company A       Accordingly, the evidence of the matching diagrams should be admitted for trial.

## VI.       MOTION TO EXCLUDE CERTAIN EVIDENCE FROM TRIAL

### A.       Evidence for which a Pre-trial Ruling of Exclusion is Sought

During discovery in this case, defendant was provided with information related to the misappropriation of proprietary information from Company A by other Company A employees. Evidence related to specific instances of theft or improper access to Company A's proprietary information by other employees should be excluded as irrelevant to the issues in this case. Specifically, during discovery in this case, defendant was provided information regarding the misconduct of several former Company A employees related to the misappropriation of Company A's confidential proprietary information.

More specifically, between late 2005 and early 2007, two Company A employees, Individual A and Individual B, who were employed by Company A in senior staff engineering positions, improperly accessed and distributed Company A's confidential proprietary information to Individual C, who served as the Chief Technology officer for a competitive telecommunications company, Company C. At the time, Individual B and Individual C were married. In addition, during 2007, another Company A employee, Individual D, who at times, was in contact with defendant, loaded Company C's source-code onto a Company A computer in violation of Company A's policies. In July 2008, after being confronted with her misconduct, Individual D attempted to misappropriate

various Company A confidential proprietary documents.

In addition to the above information, defendant has sought documentation from Company A related to the number of Company A employees found to have violated Company A's information security policies. For the reasons outlined below, any evidence related to specific instances of misconduct or statistics related to misconduct committed by other Company A employees should be excluded because it lacks sufficient probative value.

Lastly, during discovery, defendant has also received information about how Company A's security measures have evolved over time. To the extent that defendant intends to introduce any evidence of changes or enhancements made to Company A's security procedures subsequent to the charged conduct, this evidence is irrelevant to the issues at trial.

### B.    <u>Applicable Law</u>

Federal Rule of Evidence 402 provides evidence which is not relevant is not admissible. Federal Rule of Evidence 403 provides that otherwise relevant evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence. The district court has broad discretion in evidentiary matters to determine what evidence is relevant and when relevant evidence should be excluded because of the considerations enumerated in Rule 403. *United States v. Harris*, 542 F.2d 1283, 1317 (7th Cir.1976). Evidence, even if regarded as remotely relevant, is properly excluded under Rule 403 if its probative value is substantially outweighed by its tendency to cause confusion or undue delay and waste of time at the trial. *United States v. Payne*, 635 F.2d 643, 647 (7th Cir. 1980)

C.  **Argument**

Evidence of specific instances of misconduct by other Company A employees will have little to no probative value relative to the issues in this case.  The government acknowledges that, in order to sustain the charges, the government must prove that Company A maintained "reasonable security measures" to protect the trade secret documents at issue at the time in question.  However, the government need not prove that the security measures were 100% effective, only that they were reasonable. 18 U.S.C. § 1839.  Reasonable measures have been held to include advising employees of the existence of a trade secret, limiting access to proprietary information on a need to know basis, and controlling physical access. *United States v. Chung*, 2011 WL 4436271 *8 (9th Cir. Sept. 26, 2011) (internal quotations omitted); *See also United States v. Lange*, 312 F.3d 263, 266 (7th Cir. 2003) (finding that reasonable measures included storing the documents in a locked room with motion detectors, limiting access to codes used in the documents, and labeling the documents with warnings).  The fact that other individuals, at times, either ignored or circumvented security measures does not mean the measures were insufficient to be considered reasonable.  *See Computer Associates Intern. v. Quest Software, Inc.*, 333 F.Supp.2d 688, 696 (N.D. Ill. 2004) (in a case involving the Illinois Trade Secrets Act where defendant pointed out weaknesses in plaintiff's confidentiality practices, the court noted that the statute "requires only reasonable measures, not perfection").

Evidence of the specific misconduct of the individuals outlined above should not be admitted. Although evidence of the misconduct committed by other Company A employees might illustrate weaknesses in Company A's security measures, as outlined above the relevant inquiry is not about the effectiveness of the measures, rather, the inquiry focuses on the nature and scope of

the security measures that were in place at the time of the charged conduct. See e.g., *Tax Track Systems Corp. v. New Investor World, Inc.*, 478 F.3d 783, 787 (7th Cir. 2007) ("Courts evaluate this question on a case-by-case basis, considering the efforts taken and the costs, benefits, and practicalities of the circumstances."); *Matter of Innovative Const. Systems, Inc.*, 793 F.2d 875, 884 -885 (7th Cir.1986) (noting the inquiry is a "common sense judgment" and includes an "assessment of the size and nature of [the victim company's] business, the cost to it of additional measures, and the degree to which such measures would decrease the risk of disclosure.").

Moreover, any evidence of such specific instances of misconduct or evidence regarding the number of employees who have committed such infractions is likely to lead to a confusion of the issues and be a waste of time for the jury. Admission of this kind of evidence is likely to subject Company A to a wholly unnecessary "mini-trial" on its security procedures which will risk constitute a waste of time.

Lastly, any evidence or argument by defendant regarding any changes or enhancements made to Company A's security procedures after the charged conduct should be excluded as because the relevant inquiry focuses on the measures in place at the time of the offense conduct. *Compare* Fed. Rule of Evid. 407 (When measures are taken that would have made an earlier injury or harm less likely to occur, evidence of the subsequent measures is not admissible to prove negligence).

## VII. **CONCLUSION**

For the reasons outlined above, the government requests the Court issue a pre-trial ruling finding: (1) evidence of the transfer of money to China to show JIN's consciousness of guilt; (2) evidence of JIN's misrepresentation to CBP regarding the currency she carried is admissible as evidence of knowledge, preparation and intent pursuant to Rule 404(b); and (3) evidence of

misconduct by other Company A employees related to the protection of Company A's trade secrets is inadmissible because it represents insufficient probable value and could result in confusion of the issue and constitute a waste of time.

Dated: October 3, 2011

Respectfully submitted,
PATRICK J. FITZGERALD
United States Attorney

By:    /s/Sharon R. Fairley
STEVEN J. DOLLEAR
SHARON R. FAIRLEY
CHRISTOPHER J. STETLER
Assistant U.S. Attorneys
219 South Dearborn Street, 5th Floor
Chicago, Illinois 60604
(312) 353-3500

- 23 -