IN THE
UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | **08-CR-192** |
| vs. | ) | |
| | ) | **Judge Ruben Castillo** |
| HANJUAN JIN | ) | |

## HANJUAN JIN'S OBJECTIONS TO THE PRESENTENCE INVESTIGATION REPORT AND SENTENCING MEMORANDUM

HANJUAN JIN, by the FEDERAL DEFENDER PROGRAM and its attorneys JOHN F. MURPHY, BETH W. GAUS, and DANIEL P. McLAUGHLIN, respectfully requests, pursuant to 18 U.S.C. § 3553(a), *United States v. Booker*, 125 S. Ct. 738 (2005)*, Rita v. United States*, 127 S. Ct. 2456 (2007), and *United States v. Gall*, 128 S. Ct. 586 (2007), that this Court impose a sentence of probation, with any special conditions the Court deems necessary. Such a sentence is sufficient, but not greater than necessary, to comply with the purposes of sentencing enumerated in 18 U.S.C. § 3553(a). In support of this request, Ms. Jin further states as follows:

I.      **The requested non-custodial sentence is well supported by a comparison of Ms. Jin's case to other theft of trade secrets cases, consideration of the circumstances surrounding her conduct, and a review of the manner in which she has lived her life.**

Ms. Jin was convicted following a bench trial of three counts of stealing trade secrets from her employer, Motorola Corporation, in violation of 18 U.S.C. §1832(a) ("§ 1832"). Significantly, this Court acquitted Ms. Jin of three counts charging her with Economic Espionage under 18 U.S.C. §1831(a) ("§ 1831"). At trial, Ms. Jin vigorously, and successfully, disputed the allegations that she took Motorola documents for the benefit of the Chinese government. Additionally, Ms. Jin similarly disputed that the three charged documents comprised trade secrets

under the law. Notably, however, Ms. Jin never– not upon arrest, not during interrogations by and proffers with the government, not at trial, and not now– denied taking the documents from Motorola without permission. Ms. Jin has overwhelming remorse and regret for those actions, and she continues to suffer from the collateral consequences of her admittedly poor choice.

The non-custodial sentence requested by Ms. Jin is well supported by a number of factors. First, the historically small number of theft of trade secret cases allows for the Court to compare Ms. Jin's conduct here, which it found to be in violation of § 1832, and the conduct underlying the convictions in several more aggravated § 1832 cases. Though the government has yet to adopt a specific sentencing recommendation, its position with respect to the guidelines yields a range of 121 to 151 months of custodial punishment. Any custodial sentence, let alone a sentence within this range, would create a pronounced, overwhelming disparity between Ms. Jin and all other defendants who have *ever* been sentenced for the theft of trade secrets, anywhere in the United States. Such a result defies common sense and 18 U.S.C. § 3553(a)(6), which requires the Court to avoid unwarranted sentencing disparities. A sentence within the guideline range adopted by the government would be the highest sentence *ever* imposed in a theft of trade secrets case.

Next, Ms. Jin challenges the guideline calculations advocated by the government, and included in the Presentence Investigation Report ("PSR"), which erroneously ratchets up the offense level by adopting the government's positions on amount of loss. Similarly, the PSR errs in assigning Ms. Jin two additional offense levels by concluding that, in taking documents from Motorola, she intended to benefit the People's Republic of China ("PRC"). In addition, the PSR withholds acceptance of responsibility credit, despite the fact that Ms. Jin asserted a defense at

2

trial that focused on the legal requirements of the Economic Espionage Act ("EEA"), not the factual allegations underlying those charges.

Separate and apart from the guidelines, the requested sentence finds great support in an evaluation of Ms. Jin's actual conduct in this matter. That conduct, though found unlawful by the Court, stands in stark contrast to the still unproven narrative that casts Ms. Jin as a Chinese spy. The truth is far less salacious: Ms. Jin was an isolated, ill woman looking to transition her chaotic life back to her family in China in February 2007. The conduct that this Court found to be in violation of § 1832 stands in stark contrast to the honorable manner in which Ms. Jin has lived her life and the enormous personal struggles she has overcome. Any period of custody heaps unnecessary punishment on top of the already significant collateral consequences of Ms. Jin's prosecution and conviction in this matter. For all these reasons, Ms. Jin respectfully requests a sentence of probation, with any special conditions the Court deems appropriate.

II.     **A custodial sentence, let alone a sentence from anything close to the government's proposed guideline range, would create a staggering, unwarranted disparity between Ms. Jin and defendants whose offenses are demonstrably more serious than the conduct at issue in this case.**

Congress has instructed sentencing courts to avoid unwarranted sentencing disparities among similarly situated defendants. 18 U.S.C. § 3553(a)(6). Here, even the most cursory review of the sentences received by every defendant ever sentenced for federal theft of trade secrets reveals that a sentence of any number of years, let alone one from the range of 121 to 151 months, would be grossly disproportionate. A sentence within the government's guideline range would be the highest sentence ever imposed in a trade secret case. This fact, standing alone, underscores the extent to which the government's view of this case is unmoored from the

evidence introduced at trial and, more importantly, the Court's findings related to that evidence.

Since Congress enacted the EEA and added theft of trade secrets to the criminal code, 81 defendants have been sentenced after being convicted of violating § 1832.[1] Of those 81, only four have received sentences of 60 months or more. The longest sentence ever imposed in a trade secret case was 96 months. On the other end of the spectrum, 32 defendants have received sentences of straight probation, and 20 others have received sentences of one year and one day, or less. Should the Court adopt and apply the government's proposed guideline range, Ms. Jin would be the single most harshly-sentenced § 1832 defendant in history, as compared to 81 other individuals who were convicted of the same crime– many in significantly more aggravated circumstances than those presented by this case. This is an unjust result that this Court can and should avoid by focusing not only on the credible evidence of what Ms. Jin actually did, but also on her characteristics and the collateral consequences of her prosecution and conviction on three of the six counts pursued by the government.

Summaries of the following theft of trade secrets cases[2] are provided so that the Court can examine the conduct at issue in those matters, as well as the sentences imposed, and measure

---

[1] A table of cases is attached as Exhibit 1. The table includes every defendant found guilty of theft of trade secrets (§ 1832) for whom information is publicly available and details the sentence imposed in each of those cases. There are 94 federal judicial districts, split among the 50 states and additional U.S. territories. The table includes data from 87 of the 94 districts. Seven districts restrict public access to the necessary data and, as a result, the table does not include comprehensive coverage from those jurisdictions (though some defendants from known cases in those districts are included).

[2] Information and details regarding all of the summarized cases are taken from documents and transcripts that are publicly available through Pacer. Should the Court desire copies of additional materials, the defense will be happy to provide them in advance of the sentencing hearing.

them against Ms. Jin's case.  Such a review reveals that the requested non-custodial sentence for

Ms. Jin would be well supported.

- *United States v. Dimson, et al.*, 06-CR-313 (N.D. Ga.):[3]

  - In *Dimson*, three defendants were convicted of conspiring to steal trade secrets from Coca-Cola ("Coke").  One defendant, Williams, was an assistant to a global brand manager at Coke. She recruited two additional defendants to find a buyer for information and products that she stole.  Williams had signed Coke's non-disclosure confidentiality agreement.

  - After stealing a confidential marketing plan and other materials and offering them to a Pepsi executive, the defendants negotiated the sale of multiple secret documents to an undercover FBI agent they believed to be a Pepsi employee. Over the course of more than one month, Williams continued to steal documents and product samples from Coke, and the defendants provided documents and new product samples to the undercover agent, in exchange for over $15,000.  One of the defendants and the undercover met face-to-face on at least two occasions to exchange documents and material for money.

  - The defendants also agreed to provide the undercover with additional materials, including a sample of a new drink created by Coke, for $1.5 million.

  - Defendants #1 and #2 had prior federal criminal convictions.  They received sentences of 60 months and 24 months, respectively.  Williams, the insider who actively sought out and stole the information and hatched the plan to sell the information to Coke's biggest rival, Pepsi, received an above-guideline sentence of 96 months after the Court found that she obstructed justice when she testified at trial.  The sentencing judge remarked that "[he couldn't] think of another case in 25 years that there's been so much obstruction of justice."[4]  Williams's is the longest § 1832 sentence ever imposed.

---

[3] Details regarding the *Dimson* case can also be found in *United States v. Williams*, 526 F.3d 1312 (2008).  Williams was one of Dimson's co-defendants.  Their appeals were consolidated into one opinion.

[4] Associated Press, *Former Coke Secretary Sentenced to 8 Years*, available at: http://www.msnbc.msn.com/id/18822771/ns/business-us_business/t/former-coke-secretary-sentenced-years/#.UCwk8N2PWz4 (last visited Aug. 15, 2012).

- ***United States v. Malhorta*, 08-CR-423 (N.D. Cal.):**

  - In *Malhorta*, the defendant, a director with IBM, downloaded confidential, proprietary documents to an external hard drive and retained them when he left IBM for a $300,000 per year position as a vice president of business development with Hewlett-Packard ("HP"), one of IBM's chief competitors. Upon his departure, Malhorta falsely certified that he had returned all of IBM's materials.

  - At HP, Malhorta willingly shared several of IBM's documents, including a strategic plan about how IBM implemented the same type of printing services offered by HP, with senior officials. That document, which was a trade secret, included data on the costs of products and materials, as well as detailed information about IBM's inventory and approach. Malhorta obtained the latest version of this document five weeks before leaving IBM, and took the information with him to HP. IBM characterized this document as the "crown jewels" of its competitive "play book," and told the Court that it relied on the document to compete for billions of dollars of business per year.

  - Malhorta recommended that HP use the documents to secure pending deals. In an email to HP colleagues attaching the trade secret, Malhorta wrote "I would like the Pursuit Teams to have knowledge of this info as well as they know what their competition shoots for as they price their deals. This is good stuff!" He also uploaded IBM's documents to his HP-issued laptop.

  - The court found that Malhorta intended to confer a benefit to HP by disclosing information he knew to be proprietary to IBM. Further, the disclosure of this strategic plan conferred an actual, tangible benefit to HP.

  - Malhorta received a below-guideline sentence of 5 months in custody and a $3,000 fine.

- ***United States v. Wilkinson*, 07-CR-570-2 (D. Md.):**

  - Wilkinson was convicted of conspiracy to steal trade secrets, as well as conspiracy to defraud the United States and commit wire fraud. He was the co-founder and manager of two companies that provided flight support, including aviation fuel, at airports throughout Europe and Central Asia. Wilkinson paid Bittenbender, an employee of a larger competitor in the same industry, to provide him with confidential bid data and other proprietary information related to fuel supply contracts with the Department of Defense ("DoD"). Wilkinson also paid Bittenbender a percentage of the profits he earned on each contract he obtained as a result of his bid-rigging.

- Wilkinson used the unlawfully obtained trade secrets to underbid his competitor on each and every contract on which they were competing. Because of the wars in Iraq and Afghanistan, the DoD was actively bidding out aviation fuel contracts throughout Eastern Europe and Central Asia during the charged time period. Wilkinson received insider information about fuel supply contracts worldwide, including a significant contract at Bagram Air Force Base in Afghanistan. Wilkinson used the information he unlawfully obtained to win several of these contracts, thereby subverting the DoD's competitive bidding system and compromising the logistics related to United States' war effort.

- At sentencing the parties vigorously argued about the loss figures and the scope and breadth of Wilkinson's conduct. The transcript for the two day hearing is almost 400 pages long. The government advocated a sentence between 51 and 63 months for Wilkinson's procurement fraud and theft of trade secrets. The Court ultimately sentenced Wilkinson to three years' probation and fined him $20,000.[5] Bittenbender, the insider who provided the information to Wilkinson, was charged separately. He also received a sentence of three years' probation. (08-CR-005 (D. Md.)).

- *United States v. Roberts*, 08-CR-175 (E.D. Tenn.):

  - In this case Roberts and his co-defendant, Howley, were charged with five counts of theft of trade secrets, in addition to conspiracy and wire fraud counts. Both Roberts and Howley were engineers with Wyko, a tire technology company. In 2007, that company won a $1.2 million contract with Haohua South China Guilin Rubber Company ("HHSC"), a company owned and operated by the Chinese government, to build a machine that manufactured off-the-road ("OTR") tires. Such tires are used on large earth moving and mining equipment.

  - After obtaining the contract with HHSC, Roberts and Howley traveled from Tennessee to Topeka, Kansas, so that they could gain access to a Goodyear Tire facility where OTR tires were made. Because Wyko was unable to create an effective design for the machine, they decided to copy Goodyear's design, even though they knew it was protected as a trade secret.

  - The men gained access to the plant by falsely claiming that they were there to service Wyko equipment that Goodyear used in unrelated operations. Roberts and

---

[5]The government appealed the Court's guideline calculation and its conclusions on loss and restitution, the judgment was vacated, and the case was remanded for resentencing. *United States v. Wilkinson*, 590 F.3d 259, 261, 269-271 (4th Cir. 2010). On remand, the Court imposed the identical sentence a second time. After filing a notice of its intention to challenge the second sentencing, the government withdrew its appeal.

Howley each signed confidentiality agreements upon entering the plant.

- Instead of servicing their company's machinery, Roberts and Howley surreptitiously photographed the Goodyear equipment necessary for the production of OTR tires. Using a cellphone, one man took pictures while the other stood guard. When they were done, Roberts and Howley emailed the photos to a Wyko office in England. The pictures were taken so that Wyko could steal the design and build its own machine. Wyko ultimately used the materials to complete its own machine.

- Roberts and Howley contested the charges at trial, and were ultimately convicted by a jury on all counts. At a strenuously contested sentencing hearing (there are over 10 filings and a 140 page transcript from the hearing), the Court found that Roberts and Howley knew they were working for an instrumentality of the Chinese government, and also concluded that the plan's purpose was to undercut Goodyear's competitive standing in the OTR tire marketplace. If HHSC received the necessary machine from Wyko, it would be able to undercut Goodyear's pricing and steal customers.

- Despite the circumstances of their conduct and the fact that both men were found guilty after trial, Roberts and Howley were each sentenced to four years' probation.

Even a cursory comparison reveals that the cases summarized above include far more aggravated circumstances than Ms. Jin's case presents to this Court. Here, the Court concluded that the materials taken by Ms. Jin met the statutory definition of trade secrets, and that she returned to Motorola under false pretenses to access the materials. Importantly, however, the Court further concluded that Ms. Jin took the materials because she sought to refresh her memory and to prepare herself for her next job. Memo. Op. at 71-72.[6] Indeed, the Court found that there was no evidence that Ms. Jin planned to provide the documents to Sun Kaisens, nor was there anything to indicate that Sun Kaisens sought the documents, or that it was interested in iDEN technology. *Id.* at 71-72, 75-77.

---

[6] The Court's February 8, 2012, Memorandum Opinion and Order (Dckt. # 209) is referred to throughout by the abbreviation "Memo. Op."

In comparison to the cases above, Ms. Jin did not negotiate, or even attempt to negotiate, the sale of Motorola's materials to a competitor, nor did she agree to take money, much less actually receive money, in exchange for Motorola's materials. Similarly, Ms. Jin did not steal documents in order to assist a competitor's efforts to undercut Motorola's business or its standing in the marketplace. Nor did she engage in conduct at the direction of another person or business. Instead– as the Court found after trial– Ms. Jin took materials in order to help herself prepare for future employment. In other words, the benefit was to herself. Even if the documents had been provided to Sun Kaisens– a hypothetical that is unsupported by any evidence– the documents would not have conferred any competitive advantage to Sun Kaisens, which the Court concluded was focused on more advanced CDMA technology. *Id.* at 72.

Ms. Jin's conduct– though found to be in violation of § 1832– is far less egregious than the conduct of the defendants convicted of the same offense in the four cases summarized above. Indeed, most of the defendants sentenced to non-custodial or sentences of less than two years received such sentences despite the fact that they stole trade secrets with the intention of providing the materials to a competitor in exchange for money or other material benefits. In many cases, the defendants caused actual harm to their employers or former employers by taking trade secrets and successfully transferring them to competitors. Still, the sentences imposed for such offenses are drastically lower than the guideline range put forward by the government, and accepted without challenge by the PSR, in this case. A relative comparison of the real harm– or even the potential harm– caused by Ms. Jin's conduct clearly demonstrates that her requested sentence of probation is well supported. A custodial sentence in this case, under these circumstances, would create the sort of unwarranted disparity that § 3553(a)(6) disapproves.

### III. Ms. Jin's objections to the guideline calculations included in the Presentence Investigation Report.

The Probation Office parrots the government's version of the offense in calculating the applicable guidelines. Not surprisingly, then, Ms. Jin takes issue with these calculations. Specifically, Ms. Jin objects to the assessment of loss under § 2B1.1(b)(1). Ms. Jin also objects to the enhancement pursuant to §2B1.1(b)(5), which relies upon acquitted conduct to add two points to her offense level for purportedly misappropriating a trade secret with the intention of benefitting the PRC. Ms. Jin's final guideline objection is that the PSR erroneously withholds credit for acceptance of responsibility under § 3E1.1.

### A. The government's loss theory, which is incorporated into the PSR, is unsupported by and contrary to the Court's findings in this case.

Ms. Jin objects, on several grounds, to the loss calculation and corresponding 22-level guideline enhancement, proposed by the government and repeated in the PSR. Gov. Ver. at 32; PSR at 8. As an initial matter, it is important to note that there was no actual loss in this case. Therefore, the only method of assigning any loss-based adjustment to Ms. Jin's offense level is by considering intended loss, an often misleading measurement of culpability and the severity of the offense. *See* § 2B1.1, App. Note 3(A). The PSR states with little detail or analysis that the government has established by a preponderance of the evidence that "the intended loss amount is between $20 and $50 million." PSR at 8. In its version, the government bases its $20-$50 million loss calculation – which is keyed to the loss levels in § 2B1.1(b)(1)(L), (M) – on iDEN's research and development costs: one half of Motorola's iDEN-related research and development costs for 2006 and "the research and development costs related to a fraction of the hundreds of iDEN documents" Ms. Jin took. Gov. Ver. at 38. Ms. Jin maintains that the amount of intended

10

loss and corresponding loss enhancement suggested by the government and the PSR is overstated

and improper, for several reasons.

First, the government's basis for its loss calculation – iDEN's research and development

costs – erroneously rests on Ms. Jin doing something that this Court found she did not intend to

do. That is, give the Motorola documents to a third party to develop iDEN technology while

avoiding the R & D costs already incurred by Motorola. As detailed below, the government's

basis for its intended loss calculation is belied by this Court's trial rulings on Ms. Jin's intent.

The Court's key findings in this regard were:

• " . . . Jin took the trade secrets to help her prepare for her future employment [at Sun
Kaisens]." Mem. Op. at 70-71.

• "While the evidence did not establish that someone at Sun Kaisens had requested the
documents or that Jin planned to give the documents to Sun Kaisens, the evidence
demonstrated beyond a reasonable doubt that, at a minimum, Jin planned to use the
documents to prepare herself for her position at Sun Kaisens." *Id*. at 71.

• " . . . while there was no evidence regarding what the actual economic benefit to Jin
would be in terms of a dollar amount, it is clear that she planned to use the documents to
her economic benefit by using them to prepare for her next job at Sun Kaisens. Jin's
planned use of these documents would also indirectly benefit Sun Kaisens." *Id*.

• " . . . there was no evidence that Sun Kaisens sought this information, and in fact, the
evidence indicated that Sun Kaisens would likely not be directly interested in iDEN
technology because it was focused on more advanced CDMA technology. . . . even
though in the end Jin's knowledge of iDEN technology and the stolen trade secrets may
not have directly benefitted Sun Kaisens, she believed at the time she took the documents
that they would, at a minimum, help prepare her for her new job with Sun Kaisens and
meet the expectations of her new employer." *Id*. at 72.

Based on these findings, any intended loss was not and could not have been substantial,

and certainly not the tens of millions that the government now claims. For example, the Court's

findings show that neither Ms. Jin nor Sun Kaisens intended to somehow develop competing

iDEN technology, such that they would have been unjustly enriched by avoiding the R & D costs already incurred by Motorola.

At the very least, there is no reliable evidence of the tens of millions of intended loss that the government is now claiming, particularly given the lack of any direct benefit to Sun Kaisens or any other third party. In contrast, the government bases its loss estimate on the theory that Ms. Jin and "any future employer to whom she transferred the information would have been able to skip the hundreds of millions of dollars in research and development costs that otherwise would be required to compete in the iDEN market." Gov. Ver. at 38. But this basis for its loss calculations is contradicted by the Court's findings that Jin did not plan to give the documents to Sun Kaisens, that Sun Kaisens likely would not have been directly interested in iDEN technology because it was focused on more advanced CDMA technology, and that Sun Kaisens therefore would have received only an indirect benefit at best. Mem. Op. at 70-72.

Second, and more generally, the government and the PSR rely on an inappropriate method of valuation of loss – research and development costs – given the unique facts of this case. In estimating loss, § 2B1.1, App. Note 3(C) directs that "[t]he estimate of the loss shall be based on available information, taking into account, as appropriate and practicable under the circumstances, factors such as the following [and as relevant in this case]: (I) The fair market value of the property unlawfully taken [or] copied . . . (ii) In the case of proprietary information (e.g., trade secrets), the cost of developing that information or the reduction in the value of that information that resulted from the offense . . . . (v) The reduction that resulted from the offense in

the value of equity securities or other corporate assets."[7]  The language of this Application Note

suggests that the listed factors are illustrative and non-exhaustive, to be considered "as

appropriate and practicable under the circumstances."

The government bases its loss estimate on the research and development costs of iDEN,

and the PSR adopts this position without further analysis.  Gov. Ver. at 33-38; PSR at 8.  But, as

demonstrated by the non-exhaustive list of several factors in § 2B1.1, App. Note 3(C), R & D

costs do not necessarily equate with loss in all cases.  Indeed, R & D costs are not an accurate

estimate of loss in this case given the Court's finding that Ms. Jin did not intend to give the

documents to Sun Kaisens, or any other third party, (Mem. Op. at 71), such that they could

develop competing iDEN technology while avoiding the R & D costs that Motorola had already

incurred.

Given these unique facts, other measures of intended loss are more appropriate in this

case.  Each of these bases clearly pales in comparison to the government's bloated $20-$50

million figure.  One alternative method of valuing intended loss here is by hypothesizing what

Ms. Jin would have been paid by her new employer, Sun Kaisens.  Another option is the fair

market value of the documents that Ms. Jin took, *i.e.*, what they would have been worth to a third

party or potential buyer.

--------------------------------------------------

[7] The 2006 guidelines in force at the time of Ms. Jin's conduct (February 2007) do not list
development costs ((ii) above) as a measure of estimating loss.  Though the Seventh Circuit has
concluded that the use of later, harsher sentencing guidelines by sentencing courts poses no *ex
post facto* problem, there is a Circuit split on the question.  *Compare United States v. Demaree*,
459 F.3d 791, 795 (7th Cir. 2006), *with United States v. Turner*, 548 F.3d 1094, 1099–1100
(D.C. Cir. 2008) (finding application of a harsher guideline range than that in place at the time of
the offense presents a constitutional problem).  As a result, Ms. Jin asks the Court to calculate
her offense level based on the 2006 guidelines, and find that R & D provides no basis for an
intended loss enhancement.

At least with respect to Sun Kaisens, this Court found that "Sun Kaisens would likely not be directly interested in iDEN technology because it was focused on more advanced CDMA technology." Mem. Op. at 72. Nevertheless, the defense accepts for purposes of this sentencing stage that this Court found that the three charged documents, and iDEN technology in general, had at least some value to others at the time that Ms. Jin took the documents. The difficult question presented now is, what would the fair market value of the three documents have been?

Here again, the government supports its loss estimates on a premise that does not hold up, namely that Ms. Jin stole all of the documentation and information necessary to build competing iDEN technology. The government repeatedly claims throughout its filings that Ms. Jin "essentially stole the entire iDEN technology" and that anyone obtaining the documents from Ms. Jin had the means "to replicate an entire iDEN system." Gov. Memo at 2, 4.[8] The government presented that what Ms. Jin took "essentially equated to a blueprint of the iDEN technology that Motorola had invented and marketed since 1993" and that she had "the entire iDEN technology stored on her portable electronic media." Gov. Ver. at 29, 32.

The facts that the government cites thereafter undermine its claims, however, about the extent of what Ms. Jin had. Most notably, Motorola employee Bruce Drawert's own analysis shows that Ms. Jin did not in fact have all of the essential documents that made up the iDEN technology. *See* Chart at Gov. Ver. at 35. The government thereafter claims that Ms. Jin took "the critical mass," rather than the entirety, of documentation needed to create competitive iDEN technology, finally presenting that Ms. Jin actually had around a third of the critical engineering

---

[8] The government's July 9, 2012, sentencing memorandum (Dckt. # 221) is referred to throughout by the abbreviation "Gov. Memo."

documents. Gov. Ver. at 38; Gov. Memo. at 16.

Moreover, just because a potential competitor had some documents and information on iDEN technology does not mean that it could or would actually start producing competing iDEN products and technology. The government argues that Ms. Jin should receive a severe sentence in part because her "theft of iDEN technology was so vast that anyone obtaining the documents (or stealing the documents even from Defendant) had the means to replicate an entire iDEN system." Gov. Memo. at 4. This Court detailed what made up the infrastructure of an iDEN system: mobile switching centers, base station controllers, base radios, access controller gateways, packet data network elements including mobile data gateway and routers, and dispatch and application processors. Mem. Op. at 25-26. When a new customer wants to join an iDEN network, it must have several system components, such as handsets, base stations, and switching equipment. *Id.* at 27-28. Given that these infrastructure costs serve as extremely high barriers to entry, it is not foreseeable that a cellular competitor would work to replicate iDEN technology even if it had all of the documentation and information to do it.. This is particularly because, as the Court found, the iDEN system had been eclipsed by 2007. Memo. Op. at 76. This further diminishes the fair market value of what Ms. Jin took.

To summarize, the government's loss theories and calculations rest on premises that are unsupported by and contrary to the Court's findings in this case. Therefore, the proposed level of loss should be rejected, leading to a substantially lower Guideline range,[9] even before

---

[9] Additionally, in January 2012, the Sentencing Commission released its *Proposed Amendments to the Sentencing Guidelines*, stating that, "[t]he Commission has received public comment and reviewed judicial opinions suggesting that the impact of the loss table or the victims table (or the combined impact of the loss table and victims table) may overstate the

consideration of the §3553(a) factors. Without this proposed 22-level loss enhancement (and keeping all other guidelines the same as that in the PSR), Ms. Jin's Guidelines would be level 10, with an advisory Guideline range of 6-12 months' imprisonment. And even if this Court concurs with the government's loss figure, such a conclusion still does not necessitate a sentence from within the staggeringly-high sentencing range included in the PSR. *See, e.g., United States v. Meuffelman*, 400 F. Supp. 2d 368, 377-78 (D. Mass. 2005), *aff'd*, 470 F.3d 33 (1st Cir. 2006) (the "blameworthiness of a defendant found guilty of fraud is more complex than simply measuring the amount of loss"); *United States v. Emmenagger*, 329 F. Supp. 2d 416, 427 (S.D.N.Y. 2004) ("in many cases [. . .] the amount stolen is a relatively weak indicator of the moral seriousness of the offense or the need for deterrence").

**B.     The proposed two-level enhancement for intention to benefit the PRC is built upon the suspect foundation of acquitted conduct and unsupported post-trial opinions.**

The government–and by extension–the PSR both contend that this Court should enhance Ms. Jin's offense level by two points for misappropriating the documents with the intention of benefitting the PRC. Of course, Ms. Jin was acquitted by this Court of the three espionage counts brought pursuant to §1831, when it explicitly held that the government failed to prove beyond a reasonable doubt that Ms. Jin "intended or knew her conduct would benefit the PRC in any way." Memo. Op. at 75. Thus, the government asks this Court to sentence Ms. Jin on

culpability of certain offenders in [fraud] cases." *See* United States Sentencing Commission, *Proposed Amendments to the Sentencing Guidelines*, at 18. Jan. 19, 2012, available at http://www.ussc.gov/Legal/Amendments/Reader-Friendly/20120119_RFP_Amendments.pdf. As a result, "the Commission is studying whether it should limit the impact of the loss table or the victims table (or both) in cases sentenced under §2B1.1 involving relatively large loss amounts and, if so, how it should limit the impact. *Id.*

acquitted conduct.

1. *The government's position relies on a theory that was rejected by this Court at trial.*

While the Court possesses authority to consider acquitted conduct in assessing the appropriate sentence, *United States v. Watts*, 117 S. Ct. 633, 638 (1997), ample jurisprudence cautions against this remarkable and dubious practice. Significantly, a signal consideration in sentencing concerns the need for the sentence to "promote respect for the law." 18 U.S.C. § 3553(a)(2)(A). Courts have long recognized that reliance on acquitted conduct to enhance sentences can have the opposite effect on overall respect for the law, since such sentences can undermine the public's expectation that offenders are punished only for crimes of which they are convicted. *See, e.g., United States v. Coleman*, 370 F. Supp. 2d 661, 671 n. 14 (S.D. Ohio 2005) ("consideration of acquitted conduct has a deleterious effect on the public's view of the criminal justice system [because a] layperson would undoubtedly be revolted by the idea that . . . a person's sentence for crimes of which he has been convicted can be multiplied fourfold by taking into account conduct of which he has been acquitted") (internal quotation eliminated); *United States v. White*, 551 F.3d 381, 387 (6th Cir. 2008) (Merritt, J., dissenting) (recognizing that "the use of acquitted conduct is wrong as a matter of statutory and constitutional interpretation and violates both our common law heritage and common sense.").

Although appellate courts have held that it is constitutionally permissible to consider acquitted conduct at sentencing, significant concern for this practice exists and serious questions remain about whether it violates the Sixth Amendment. *See e.g., United States v. Canania*, 532 F.3d 764, 777 (8th Cir. 2008) (Bright, J., concurring) ("the consideration of acquitted conduct

undermines the notice requirement that is at the heart of any criminal proceeding."); *United States v. Mercado*, 474 F.3d 654, 658 (9th Cir. 2007) (Fletcher, J., dissenting) ("reliance on acquitted conduct in sentencing diminishes the jury's role and dramatically undermines the protections enshrined in the Sixth Amendment."); *United States v. Faust*, 456 F.3d 1342, 1349 (11th Cir. 2006) (Barket, J., specially concurring) ("sentence enhancements based on acquitted conduct are unconstitutional under the Sixth Amendment, as well as the Due Process Clause of the Fifth Amendment."). A recent government study indicates that 84% of judges believe that it is inappropriate to consider acquitted conduct at sentencing.[10]

Nevertheless, the government's entreaty–adopted unquestioningly by the PSR –falls well short of the preponderance of the evidence standard enunciated in *Watts,* 117 S. Ct. at 638, and *Rita*, 127 S. Ct. at 2465. The evidence woefully failed to establish– under any standard– that Ms. Jin intended to benefit the PRC, or that she knew that her conduct might have produced that result. The Court's ruling acknowledged that the evidence failed to establish a link between the Chinese military and the documents in Ms. Jin's possession. Memo. Op. at 76. In fact, the Court described the connection between the Chinese military or the PRC and the iDEN technology as "a stretch at best." Memo. Op. at 77. The Court also found that "the government put forth no evidence that Jin was asked or directed to take the trade secrets...the evidence did not establish that Jin planned to give the trade secrets to Sun Kaisens, let alone the PRC." *Id.* at 75. Furthermore, the Chinese military documents that Ms. Jin had in her possession contained only

---

[10] United States Sentencing Commission, *Results of Survey of United States District Judges January 2010 through March 2010*, Question 5 (2010), available at: http://www.ussc.gov/Research/Research_Projects/Surveys/20100608_Judge_Survey.pdf (last visited August 19, 2012).

"minor references to technology that could possibly relate to iDEN." *Id.* at 77.  This Court found

that "nearly all" of them pertained to telecommunications systems both superior to and

incompatible with iDEN technology.  *Id.* at 76.

Indeed, the evidence showed that the telecommunication systems that the Chinese

military sought to develop required technology "that was superior to and incompatible with"

iDEN.  *Id.*  At the time of the offense, more advanced technology had surpassed iDEN, rendering

it outdated and making it likely that iDEN would "be phased out of use in the not-too-distant

future." *Id.*  The government failed to explain why the Chinese military would be interested in

technology that was "not cutting-edge," and that would not give the PRC any "tactical,

reputational, or other benefit."  *Id.*  Thus, the government's claim is devoid of any logical or

evidentiary heft.

As this Court stated in its ruling, there exists at best only "speculative proof" that the

PRC could have benefitted from Jin's conduct.  Memo. Op. at 77.  Speculative proof does not

equate to proof by a preponderance of the evidence; rather, due process requires that sentencing

determinations be based on reliable evidence, not speculation or unfounded allegations. *See*

*United States v. Santiago*, 495 F.3d 820, 824 (7th Cir. 2007); *United States v. Noble*, 246 F.3d

946, 951 (7th Cir. 2001); *see also United States v. Berry*, 553 F.3d 273, 284 (3d Cir. 2009) ("A

defendant cannot be deprived of liberty based upon mere speculation.").

> 2.  *Bateman's latter-day opinions, based upon dubious sources,*
> *provide no reliable support for the government's position.*

The government's willingness to operate at the outer margins of due process protections

becomes plain in its proffering of the opinions of Shawn Bateman.  In her statement, forwarded

to the Court by the Probation Officer on July 11, 2012, Bateman opines that Ms. Jin was a spy for the PRC.[11] Bateman at 1. Putting aside for the moment the substantive reliability– or lack thereof– of this opinion, the post-trial presentation of these new opinions begs the question: Why now? As the Court recalls, Bateman was a government witness at trial. She testified about the Chinese military. She testified about the Communist Party in the PRC. She testified to the Chinese military-industrial complex. Not once did she even refer to Ms. Jin, much less opine that she was a spy. Not once did Bateman offer an opinion about Ms. Jin's conduct from the witness stand, thus foreclosing the Court from any chance to assess the credibility of these opinions.

The only reasonable inference to be drawn from the government's refusal to allow scrutiny of Bateman's opinions at trial is that the government lacked confidence in the persuasiveness of these opinions. If the government found Bateman's position on these topics powerful, common sense dictates that it would have elicited the opinion. The conscious decision to hold back for sentencing suggests a lack of confidence in Bateman's latter-day opinions. In the end, then, the analysis for this Court at this moment is: Should the Court have confidence in an opinion–to such a degree that it increases Ms. Jin's sentence–when the government's actions clearly evince skepticism over the reliability of the same opinions.

And there should be great skepticism over Bateman's opinions. The sheer speculation, mischaracterization, guesswork, reliance on uncorroborated statements, gaping factual gaps and plain illogic of her memo, makes responding to each point wasteful. An objective reading of

---

[11]Bateman's post-trial memorandum is referred to throughout by the abbreviation "Bateman."

Bateman's post-trial report demonstrates its unreliability. Yet, a few points are worthy of highlighting.

Bateman suggests that Ms. Jin fits the profile of a spy for several reasons, each of which fails in the face of even superficial scrutiny. Bateman paints such a broad depiction of espionage characteristics, many Chinese nationals in this country would be considered suspect for no valid reason. For instance, it is significant to Bateman that Ms. Jin attended a university in China that she claims was a top military mobile communications research center. Bateman at 4. Yet, Bateman blithely discounts the critical fact that Ms. Jin studied Physics– not telecommunications– and ignores the total absence of evidence that Ms. Jin knew anyone associated with mobile communications at that university. *Id.*

Bateman also finds it meaningful that Ms. Jin enrolled at the University of Notre Dame, since the PRC would have had to approve it. *Id.* This, of course, implicates every Chinese person attending a university in the United States as a potential spy. Furthermore, no evidence exists that China took notice of Ms. Jin's attendance, or that it "garnered official interest," as Bateman claims. After all, there are vast numbers of graduate and undergraduate students from the PRC on the campuses of America's colleges and universities. USA Today reported that in 2008 alone, 98,150 Chinese students "poured into U.S. colleges and universities."[12] While the Chinese government may officially approve all such arrangements, it is difficult to imagine that each of these students is the subject of government interest, never mind grooming as potential

---

[12] Mary Beth Marklein, *Chinese college students flocking to U.S. campuses*, USA Today, Dec. 8, 2010, at 1A, available at: http://www.usatoday.com/news/education/2009-12-08-1Achinesestudents08_CV_N.htm (last visited August 22, 2012).

spies.

Bateman also claims that possession of Chinese military documents indicates that Ms. Jin was vetted by the PRC and given security clearance. Bateman at 5. This, of course, ignores the uncontradicted evidence that Ms. Jin was given the documents by an employee of Sun Kaisens. No evidence exists that the PRC knew Ms. Jin possessed those documents, or that she had any affiliation with the government of the PRC. The government monitored Ms. Jin's communications, including telephone calls and email, for an untold– though lengthy– period of time. Despite these steps, no evidence establishing any connection between Ms. Jin and the PRC's government was ever presented.

Other points Bateman found compelling include the fact that Ms. Jin traveled to China from the U.S. (like multitudes of Chinese do); that she knew how to download information onto electronic media (thus dragooning even the most primitive computer users into an expansive grouping of potential spies); and that she performed consulting work for Lemko while employed at Motorola, thus making her subject to "exploitation" (notwithstanding the complete lack of evidence of exploitation or any meaningful explanation as to why exposing that fact would truly lead to Ms. Jin committing serious acts of espionage; indeed Ms. Jin readily admitted her work at Lemko to agents questioning her at O'Hare). *Id.* at 4-6.

Bateman's speculation is not confined to Ms. Jin. She also provides unreliable information about iDEN. Bateman takes the significant position that the "iDEN information that Jin attempted to take in China would have given the PRC access to technology that the U.S. Department of Defense was reportedly going to purchase." Bateman at 11. Since the government adduced no evidence whatsoever at trial indicating that the DoD intended to invest in iDEN, the

source of this critical information is of paramount importance. Bateman cites to an article in *Urgent Communications*–the official publication of something called the International Wireless Communications Expo– as authority for her conclusion. *Id.*; Exh. 2.[13]  In fact, this "publication" is nothing more than an essay on the need for better communication among first responders which includes a "rumor" (its own characterization) that DoD wanted to buy iDEN. Exh. 2. According to the article, such a purchase offered a "fantastic way to get rid of something that in essence is going to be shut down." *Id.*

Most importantly, the article does not cite to an official report, news release, or governmental source. In fact, the article does not refer to "information," as Bateman suggests in her statement. Rather, it refers to unsourced "rumors," a word Bateman chose to elide from her report's summary of the article. There is no evidence that the DoD, in fact, sought to buy iDEN in January 2006. The DoD never issued any statement on the subject that counsel could find, and no announcement or report by a reputable news source corroborates this. Not only, then, does Bateman's point crumble under evaluation, the credibility of her entire post-trial missive becomes irredeemable. If one bases an opinion on the maunderings of *Urgent Communications*, one's reliability shatters.

Bateman claims that "China's acquisition of iDEN source code and other trade secret information would undoubtedly give China's telecommunications companies the ability to undercut Motorola's monopoly over its iDEN market share." Bateman at 11. Putting aside the unjustified assumptions inherent in that statement ("would undoubtedly"?), Bateman simply provides no support for this claim. Moreover, Bateman lacks the expertise and authority to opine

---

[13]*See IDEN's Murky Future*, attached as Exhibit 2.

on the telecommunications industry, and that opinion should therefore be stricken, or, at the very least, disregarded by the Court.

Yet undaunted by the absence of facts or knowledge, Bateman moves on to assert that China would have undercut Motorola in Africa's iDEN market. *Id.* In support, Bateman cites an online article entitled *China's Telecoms and Wireless Drums for Africa.*[14] Bateman mischaracterizes the article she cites. The article merely describes the growth of the telecommunications market in Africa while describing the different telecom projects that Chinese and other global firms have obtained. Most importantly, the article makes absolutely no reference at all to either iDEN technology or push-to-talk technology. Indeed, the article undermines Bateman's point since it makes clear that China has made significant inroads into the African telecommunications market *without* iDEN technology. Exh. 3.

Neither the evidence at trial nor the latter-day Bateman report provide any basis to enhance Ms. Jin's sentence. The Court's acquittal of Ms. Jin on the espionage counts correctly assessed the weakness of the government's position, and the Bateman report merely underscores this lack of actual proof. The Court should reject the government's unreasonable request to sentence Ms. Jin as if she was convicted of the § 1831 charges. She was not. Not only did the government fail to prove its position beyond a reasonable doubt, it has failed to provide this Court with any reliable evidence that Ms. Jin intended to confer a benefit upon the PRC or *anyone* or *anything* other than herself. As a result, the Court should not only decline to impose the two-level enhancement under § 2B1.1(b)(5), it should also discredit the government's attempts to have Ms. Jin sentenced as something she is not and never was: a spy.

---

[14]A copy of this article is attached as Exhibit 3.

**C.    Because Ms. Jin's defense focused on the legal requirements of the EEA, not the factual allegations underlying those charges, she is entitled to a two-point reduction for acceptance of responsibility.**

Under § 3E1.1, the applicable offense level is reduced by two levels if a defendant clearly demonstrates acceptance of responsibility.  Application Note 2 is instructive in Ms. Jin's situation.

> This adjustment is not intended to apply to a defendant who puts the government to its burden...at trial by denying the essential *factual* elements of guilt, is convicted, and only then...expresses remorse.  Conviction by trial, however, *does not automatically preclude a defendant from consideration for a such a reduction.*  In rare situations a defendant may clearly demonstrate an acceptance of responsibility for his criminal conduct even though he exercises his constitutional right to trial.  *This may occur, for example, where a defendant goes to trial to assert and preserve issues that do not relate to factual guilt (e.g., to make a constitutional challenge to a statute or a challenge to the applicability of a statute to his conduct).*

Excerpt of § 3E1.1, Application Note 2 (emphasis added).

The example provided in the Application Note speaks to Ms. Jin's defense and her current posture before this Court.  Ms. Jin's trial defense was two-pronged.  First, the defense successfully contested the § 1831 counts by demonstrating the government's lack of evidence that Ms. Jin intended to benefit the PRC.  Therefore, her acceptance of responsibility should not be measured against the government's allegations, rehashed in its sentencing submissions, related to those EEA counts.  Second, Ms. Jin asserted that the documents in her possession did not meet the statutory definition of trade secrets, as defined by 18 U.S.C. § 1839.  Though the Court concluded that the three charged documents were trade secrets, this finding does not preclude Ms. Jin from a two-level reduction for acceptance of responsibility.

This is because Ms. Jin's defense related to the applicability of the statute to her conduct and did not, in any meaningful way, challenge the factual conduct alleged by the government. To state it simply, Ms. Jin argued to the Court that her conduct, over which there was no dispute, did not violate § 1832. Not once during trial did the Court hear counsel argue that Ms. Jin did not take the documents, that she never worked or intended to work for Sun Kaisens or Lemko, that she did not seek to take the materials in her possession to China, or that she was somehow made into an unwitting courier.

The standard for obtaining acceptance credit post-trial is not impossible to meet. Just last year, in *United States v. Blagojevich*, (08-CR-881, N.D. Ill.), Judge Zagel credited the former governor with a two-level acceptance reduction following his conviction, after a second trial, in a case involving significantly more factual disputes than Ms. Jin's case presents. Ms. Jin's argument that the three charged documents did not meet the statutory definition of trade secrets should not be used to deny her a two-level reduction. *See, e.g., United States v. Fells*, 78 F.3d 168, 171-72 (5th Cir. 1996) (reversing sentencing court's denial of acceptance credit in felon-in-possession case after defendant challenged government's theory of constructive possession, a pure legal issue, at trial).

## IV. Ms. Jin's personal history and characteristics provide the Court with additional support for a sentence of probation.

Ms. Jin's life stands in dramatic contrast to the actions which have led her to stand before this Court for sentencing. Indeed, Ms. Jin rose from the obscurity of life in rural China to academic and professional excellence through a very simple formula–hard work to support unique intellectual abilities. Moreover, in the last decade, Ms. Jin has overcome a series of

physical and personal tribulations with a grace that underscores the fortitude and toughness that has characterized the totality of her life.  Consequently, her actions in this case do not represent the individual who for the 36 years prior, and the more than five years since the offense conduct, otherwise behaved honorably and responsibly.  Moreover, the collateral consequences of her actions and this prosecution represent a harshly enduring legacy that will forever constrain her life's prospects.

Ms. Jin was raised in a village in Anhui Province in central China.  Her father was a school teacher and her mother worked in a factory.  PSR at 9.  Ms. Jin was the youngest of five children and the only girl.  *Id.* at 10.  The family's financial circumstances were described by Ms. Jin as "poor and kinda hard."  *Id.*  Her brother, Zhengquian Jin, indicates that during her childhood the family "endured a lot and tried hard to survive, we lived a poor but fulfilling life."[15]  Exh. 4.

From a young age, Ms. Jin exhibited an excellent, studious personality. She was selected to attend a boarding high school for girls.  Her academic pursuits were a source of family pride, but also sapped "most of her family's resources."  PSR at 10.  Ms. Jin's scholarship led to her admission in 1987 to the prestigious University of Science and Technology in Hefei, China.  As Ms. Jin's brother stated, she was "always a A+ student, got into the best high school in our hometown, and excelled academically and was well respected by her peers. She received great education from one of the top universities in China...we are extremely proud of her."  Exh. 4.  At the university, Ms. Jin enrolled in the demanding Modern Physics curriculum–one of only five

---

[15] A letter from Ms. Jin's brother,  Zhengquian Jin (with translation), is attached as Exhibit 4.

women in her class in this program.

Ms. Jin completed the five-year program in 1992, and, following graduation, was hired to perform research in the Nuclear Structure Laboratory at the Modern Physics Institute in Lanzhou, China. There, she performed basic research on atomic structure. Ms. Jin lived in a dormitory on the institute's campus and worked at MPI until 1996.

While at MPI, Ms. Jin met Jige Chen, a mechanical engineer working in a different laboratory. After a brief courtship, the two married in 1992. PSR at 10. Within several months of the wedding, Jige Chen moved to Beijing– a distance of nearly 1,000 miles– to work for a business that developed oil well measurement devices. A year later, he returned to Lanzhou to start his own business doing the same thing. This was the start of a pattern of Ms. Jin and Jige Chen living variously together and separately based on the contingencies of their professional and educational lives. This pattern created turmoil and instability that would ultimately lead to Ms. Jin choosing to return to China in 2007.

Since her college years, Ms. Jin entertained the idea of advancing her education at a university outside China. She contemplated an advanced degree and a career in academia. In 1996, she enrolled in a Ph.D. program in Nuclear Physics at the University of Notre Dame in South Bend, Indiana. PSR at 12. Notwithstanding the cultural adjustments attendant to such a move, Ms. Jin again excelled academically, receiving a master's degree with a 3.6 GPA. *Id.*

At some point, Ms. Jin's interest in an academic career as well as the field of nuclear physics began to wane. She contemplated entering the business world to earn a living. While attending a job fair at Notre Dame in the winter of 1997, Ms. Jin interviewed with a representative of Motorola. This initial interview led to follow up interviews and, ultimately, a

job offer. Ms. Jin began her employment in June, 1998. *Id.* at 13.

Although she had no formal training or background in computer technology or telecommunications, Ms. Jin was assigned to Motorola's iDEN system test architecture group. She enhanced her education during her employment by obtaining a master's degree in computer science from the Illinois Institute of Technology in Chicago in 2000. Again, Ms. Jin excelled academically, receiving a 3.5 GPA. *Id.* at 12.

As the Court is aware from the trial testimony, Ms. Jin was an exemplary employee for Motorola, consistently receiving excellent evaluations from her superiors. Yet, during her tenure with the company, the structure of her life began to crack. Her eldest brother died from cancer in 1998. PSR at 10. Her father died of a stroke in 2003. *Id.* at 9. She was separated from her family in China during these tribulations. In 2005, she became pregnant, and, since the pregnancy was high risk, needed to take a medical leave from Motorola. Sadly, her hopes for motherhood were dashed when she suffered a miscarriage.

Even more dangerously, in February 2006, Ms. Jin contracted tuberculosis which led to meningitis. PSR at 11. Her condition was grave and she spent 21 days isolated in quarantine. Ms. Jin had a tube inserted in her skull to relieve the swelling on her brain caused by the meningitis. Recovery took many months, requiring a second hospitalization.

At the time of the offense conduct, Ms. Jin was contending with recovery from a near-fatal illness, a recent miscarriage, an absent husband, an ill mother, a distant family, and the insecurity that comes with nearly a year's absence from her work. It would be an understatement to say she was leading a lonely and uncertain life in the U.S. The decisions Ms. Jin made in 2007 must be viewed in this context.

29

Moreover, the trajectory of Ms. Jin's life following arrest has been rocky at best. She and her husband sold their house in Schaumburg largely to pay legal expenses. Twice she found employment in the software engineering field only to be fired when her employers learned of the charges. PSR at 13. After bouts of unemployment, Ms. Jin found part-time work providing in-home care for the elderly at minimum wage. *Id.* at 12. Ms. Jin's financial circumstances led to very reduced living circumstances. In essence, she has relied on the kindness of friends who have allowed her to live in their homes. Presently, Ms. Jin resides with the Zhao family in Aurora, Illinois, where she rents a bedroom. *Id.* at 10-11.

Ms. Jin continues to struggle with her health. In March 2011, she was diagnosed with ovarian cancer. *Id.* at 11. This condition required a hysterectomy, ending her hopes for pregnancy. She also completed a course of chemotherapy. While the chemotherapy appears to have been successful, her physicians detected a small mass in her pelvis this past March 2012. *Id.*; 7/11/12 Supplement to PSR at 2. A follow-up exam last month showed that the mass had not grown. Another exam is scheduled for October. Continuity of care, with the same team of doctors who have treated Ms. Jin's cancer, is a relevant consideration under § 3553(a)(2)(D) (requiring the sentence imposed to provide medical care in the "most effective manner"). The Court can also consider Ms. Jin's medical problems as the basis for a traditional departure under § 5H1.4, which states that physical condition may be relied upon as the basis for a reduced sentence.

The guideline range accounts only for the nature of Ms. Jin's offense conduct. It does not in any way account for Ms. Jin's life or circumstances, her fine attributes and her unique vulnerabilities. It is silent on these critical sentencing facts in a way that is deafening. As a

consequence, the guideline range does not fairly evaluate this case or this person. Even if the Court declines to accept the government's loss calculation and the stratospheric range provided in the PSR– the resulting guideline range provides a sentence far greater than necessary to meet the needs and goals of §3553(a).

V.     **The collateral consequences of Ms. Jin's prosecution and conviction, standing alone, provide substantial punishment for her conduct.**

The government seeks a significant custodial sentence in this case. Yet, in many ways, Ms. Jin's punishment for her actions began upon her arrest and will continue for the rest of her life. The collateral consequences she has suffered and continues to suffer as a result of her arrest and conviction should be considered by the Court in determining her sentence.

As the Court well knows, Ms. Jin's life was irreversibly altered upon her arrest. That change was cemented with her conviction. Prior to her arrest, Ms. Jin was a highly-skilled, highly-trained, well-respected computer software programmer. Her livelihood was based on this career. Her actions led not only to her dismissal from Motorola, it exiled her from her professional field into perpetuity. Ms. Jin, since her arrest, twice received employment in her industry. Twice she was fired by her employers when they learned of this case. As the PSR indicated, Ms. Jin has been relegated to part-time work at near minimum wage. Her employment prospects are radically diminished and non-existent in her area of expertise. Though the government may retort that Ms. Jin has no one to blame but herself for these consequences, such a response fails to address the fact that Ms. Jin has been and continues to be punished for her conduct in these ways.

In addition to the impact of Ms. Jin's conviction on her career, her personal life continues

31

as a struggle in large measure due to her actions and her conviction. Her husband remains in China raising an adopted daughter. PSR at 10. He is literally and emotionally separated from her. Ms. Jin's ill mother remains in China. Although she maintains strong relationships with her family members through regular telephone contact, the dangerous consequences facing Ms. Jin upon any return to China make it unlikely that she can reunite with her family in the near future, if ever.

Recent amendments to China's Criminal Procedure Law provide government officials there with sweeping powers to detain individuals accused of (not proven to be) endangering state security by revealing "state secrets," considered a national security crime.[16] Exh. 5. The government of the PRC may detain such suspects in undisclosed locations and hold them for up to six months before formally filing charges.[17] Exh. 6. Additionally, suspects may be denied access to a lawyer for the duration of this detention period, and the government is not required to immediately inform a person's family of his or her whereabouts. *Id.* Once an individual is finally charged, no guarantee of a fair trial exists; the amended law now provides that cases sensitive to national security (as defined by the government) may be conducted in closed hearings. *Id.*

The danger that awaits Ms. Jin in China is illustrated by the recent conviction of a naturalized U.S. citizen, Xue Feng, who was sentenced to eight years in prison under China's

---

[16] A copy of the article, *China to enact new secret detention law*, is attached as Exhibit 5.

[17] A copy of the Library of Congress publication, *China: Amendment of Criminal Procedure Law*, is attached as Exhibit 6.

powerful state secrets law.[18] Exh. 7. Xue purportedly attempted to purchase a database about China's oil industry while working for a U.S.-based energy consulting firm. *Id.* Although the database was not classified as a state secret until after Xue was arrested, the Chinese government accused him of gathering intelligence and unlawfully sending state secrets abroad. Exh. 5. He was secretly detained in Beijing and held for three weeks before law enforcement officials notified the American government of his detention, despite his U.S. citizenship. *Id.* By the time Xue was finally permitted to talk to counsel, thirty-two days into his detention, he had already been tortured and coerced into signing false documents. *Id.*

Ms. Jin faces a very similar risk should she choose to return to China– to see her sick mother or her husband and their adopted daughter– not based on her possession of purportedly sensitive intelligence material, but rather because of the false appearance, created by news accounts of her arrest and trial, that she is a compromised espionage agent. Given these accounts, there is a real risk that the Chinese government will act on perception, not reality. As a result, whatever the outcome of Ms. Jin's sentencing hearing, she is likely to be separated from her family forever.

In spite of these difficulties, Ms. Jin's conduct during the year between her arrest and her indictment, as well as the four-plus years since the grand jury returned charges against her, has been nothing short of exemplary. Ms. Jin has complied unstintingly with all conditions of pretrial release, including home confinement with electronic monitoring. As in the entirety of her life prior to February 2007, Ms. Jin has lived an honorable and law-abiding life over the last five years and a half years. This track record suggests that a custodial sentence would be greater than

---

[18] A copy of the article, *China jails US geologist for 8 years,* is attached as Exhibit 7.

necessary to provide just punishment, afford adequate deterrence, or protect the public. 18 U.S.C. § 3553(a)(2).

Ms. Jin's conduct was serious. Just as serious are the permanent consequences she faces as a result. Ms. Jin cannot return to China except at extraordinary risk, cannot reunite with family, cannot work in her profession or any profession remotely similar. Her life is lonely and thoroughly circumscribed. These harsh realities are the fruits of her actions and her conviction. The Court should take them into account when determining the extent of her sentence.

## VI. Conclusion.

For the reasons stated above, Hanjuan Jin respectfully requests that this Court impose a

sentence of probation, with any special conditions it finds appropriate, as such a sentence fulfills

the various goals of sentencing in 18 U.S.C. § 3553(a).

Respectfully submitted,

FEDERAL DEFENDER PROGRAM
Carol A. Brook
Executive Director

By:    *s/ John F. Murphy*
       John F. Murphy

       *s/Beth W. Gaus*
       Beth W. Gaus

       *s/Daniel P. McLaughlin*
       Daniel P. McLaughlin
       Attorneys for Hanjuan Jin

JOHN F. MURPHY
BETH W. GAUS
DANIEL P. McLAUGHLIN
Federal Defender Program
55 East Monroe, Suite 2800
Chicago, IL 60603
(312) 621-8300

The undersigned, Daniel P. McLaughlin , an attorney with the Federal Defender Program hereby certifies that in accordance with FED.R.CRIM. P. 49, FED. R. CIV. P5, LR5.5, and the General Order on Electronic Case Filing (ECF), the following document(s):

**HANJUAN JIN'S OBJECTIONS TO THE PRESENTENCE INVESTIGATION REPORT AND SENTENCING MEMORANDUM**

was served pursuant to the district court's ECF system as to ECF filings, if any, and were sent by first-class mail/hand delivery on August 22, 2012, to counsel/parties that are non-ECF filers.

FEDERAL DEFENDER PROGRAM
Carol A. Brook
Executive Director

By: *s/ Daniel P. McLaughlin*
      Daniel P. McLaughlin

DANIEL P. McLAUGHLIN
Federal Defender Program
55 E. Monroe, Suite 2800
Chicago, Illinois 60603
(312) 621-8300

IN THE
UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

UNITED STATES OF AMERICA    )
                                    )     **08-CR-192**
vs.                        )
                                      )     **Judge Ruben Castillo**
HANJUAN JIN               )

**EXHIBITS TO HANJUAN JIN'S OBJECTIONS TO THE PRESENTENCE
INVESTIGATION REPORT AND SENTENCING MEMORANDUM**

1.    Table of § 1832 Convictions and Sentences Imposed

2.    Lynette Luna, *IDEN's Murky Future*, URGENT COMMUNICATIONS, Jan. 1, 2006

3.    Zhao Hejuan and Zhang Yuhze, *China's Telecoms and Wireless Drums for Africa*, CAIXIN ONLINE, Feb. 22, 2012

4.    Summer 2012 Letter from Zhengquian Jin (with translation)

5.    Jamil Anderlini, *China to enact new secret detention law*, FINANCIAL TIMES, Mar. 3, 2012

6.    *China: Amendment of Criminal Procedure Law*, Library of Congress, last updated: Apr. 9, 2012

7.    Leslie Hook, *China jails US geologist for 8 years,* FINANCIAL TIMES, July 5, 2010

**Exhibit 1:**     **Table of § 1832 Convictions and Sentences Imposed**

# Table of § 1832 Convictions and Sentences Imposed[1]

| YEAR | JURISDICTION | CASE NAME | SENTENCE |
|---|---|---|---|
| 1997 | M.D. Tenn. | U.S. v. Davis, 97-CR-124 | 27 months custody, 36 months supervision |
| 1997 | S.D. Tex. | U.S. v. Trujillo-Cohen, 97-CR-251 | 48 months custody, 36 months supervision |
| 1997 | W.D. Pa. | U.S. v. Worthing, 97-CR-09 | 15 months custody, 36 months supervision |
| 1997 | E.D. Pa. | U.S. v. Hsu, 97-CR-323 | Time served (approx. 3 months), 24 months supervision, $10k fine |
| 1998 | E.D. Tex. | U.S. v. Hallstead, et al., 98-CR-41 | Def. #1: 77 months custody, 36 months supervision, $10k fine<br><br>Def. #2: 60 months custody, 36 months supervision, $50k fine |
| 1998 | N.D. Ga. | U.S. v. Soucy, 98-CR-59 | 36 months probation, $1K fine |
| 1998 | N.D. Ga. | U.S. v. Campbell, 98-CR-64 | 90 days custody, 36 months supervision |
| 1998 | D. Me. | U.S. v. Camp, et al., 98-CR-48 | Def. #1: 36 months probation<br><br>Def. #2: 1 year and 1 day custody |
| 1998 | W.D. Pa. | U.S. v. Fulton, 98-CR-59 | 5 years probation (home detention of 12 months) |
| 1998 | E.D. Mich. | U.S. v. Krumei, 98-CR-80943 | 24 months custody, 24 months supervision |

---

[1] This table includes every defendant found guilty of theft of trade secrets (18 U.S.C. § 1832) for whom information is publicly available. The details of the sentences imposed in each of these cases are also included. There are 94 federal districts, split among the 50 states and additional U.S. territories. The table includes comprehensive data from 87 of the 94 districts. Seven districts restrict public access to the necessary data and, as a result, the table does not include *comprehensive* data from those districts, though several cases from those districts (such as the Central District of California) are included in the table.

Exhibit 1

1

| 1999 | E.D. Wis. | U.S. v. Lange, 99-CR-174 | 30 months custody, 36 months supervision |
|------|-----------|--------------------------|------------------------------------------|
| 1999 | S.D. Tex. | U.S. v. Tamper, 99-CR-158 | 15 months custody, 24 months supervision |
| 1999 | S.D. Tex. | U.S. v. Costello, 99-CR-23 | 36 months probation |
| 1999 | N.D. Tex. | U.S. v. Shearer, 99-CR-433 | 27 months custody, 36 months supervision |
| 1999 | E.D. Cal. | U.S. v. Kern, 99-CR-15 | 1 year and 1 day custody, 36 months supervision |
| 1999 | E.D. Pa. | U.S. v. He, 97-CR-323 | Time served in custody (approx. one month), 24 months supervision, $10k fine |
| 2000 | N.D. Ohio | U.S. v. Yang, et al.,97-CR-288 | Def. #1: 51 months custody, 36 months supervision<br><br>Def. #2: 24 months custody, 36 months supervision |
| 2000 | N.D. Ga. | U.S. v. Williams, 00-CR-503 | 22 months custody, 36 months supervision |
| 2000 | W.D. Pa. | U.S. v. Everhart, 00-CR-56 | 12 months probation |
| 2000 | N.D. Cal. | U.S. Chang, 00-CR-20203 | 1 year and 1 day custody, 36 months supervision |
| 2000 | M.D. Fla. | U.S. v. Rector, et al., 00-CR-123 | Def. #1: 14 months custody (7 mos. BOP / 7 mos. community confinement), 24 months supervision<br><br>Def. #2: 10 months custody (5 mos. BOP / 5 mos. community confinement), 24 months supervision |
| 2001 | D. Conn. | U.S. v. Daddona, 01-CR-122 | 36 months probation |
| 2001 | S.D. Fla. | U.S. v. Petrolino, et al., 01-CR-6291 | Def. #1: 24 months probation |

Exhibit 1                                                    2

| | | | |
|---|---|---|---|
| | | | Def. #2: 1 year and 1 day custody, 24 months supervision |
| 2001 | S.D.N.Y. | U.S. v. Estrada, 01-CR-616 | 12 months custody, 24 months supervision |
| 2002 | D. Del. | U.S. v. Morris, 02-CR-120 | 24 months probation, 100 hours community service |
| 2002 | N.D. Iowa | U.S. v. Gunderson, 02-CR-55 | 37 months custody, 24 months supervision |
| 2002 | S.D.N.Y. | U.S. v. Kissane, 02-CR-626 | 9 months custody, 15 months supervision |
| 2002 | E.D.N.Y. | U.S. v. Helrigel, 02-CR-666 | 24 months probation |
| 2002 | N.D. Ga. | U.S. v. Rogers, 02-CR-94 | 12 months probation, 100 hours community service |
| 2002 | S.D. Fla. | U.S. v. Pompa, 02-CR-14014-2 | 5 months custody, 36 months supervision |
| 2002 | D. Kan. | U.S. v. Dorn, 02-CR-20040 | 24 months probation |
| 2002 | D. Conn. | U.S. v. Smith, 02-CR-163 | 60 months probation |
| 2002 | D. Conn. | U.S. v. Halvorsen, 02-CR-002 | 24 months probation, $2k fine |
| 2002 | D. Conn. | U.S. v. Sprenger, 02-CR-087 | 6 months custody, 36 months supervision, $3k fine |
| 2002 | D. Or. | U.S. v. Hawkins, 02-CR-469 | 60 months probation, 6 months home detention, $2k fine |
| 2002 | D. Mass. | U.S. v. Forgues, 02-CR-4001 | 2 months custody, 36 months supervision |
| 2003 | C.D. Cal. | U.S. v. Serebryany, 03-CR-042 | 60 months probation |
| 2003 | N.D. Cal. | U.S. v. Murphy, 03-CR-20038 | 36 months probation, 6 months home confinement, $2k fine |
| 2003 | N.D. Cal. | U.S. v. Woodard, 03-CR-20066 | 24 months custody, 36 months supervision |
| 2005 | W.D. Mich. | U.S. v. Ulmer, 05-CR-203 | 12 months probation, $1,200 fine |

Exhibit 1                3

| 2005 | W.D. Pa. | U.S. v. Frena, 05-CR-039 | 6 months custody, 36 months supervision |
|------|----------|--------------------------|------------------------------------------|
| 2005 | C.D. Cal. | U.S. v. Platts, 05-CR-430 | 24 months probation |
| 2005 | N.D. Cal. | U.S. v. Rashidi, 05-CR-744 | 48 months probation, 10 months home confinement, $6k fine |
| 2005 | S.D.N.Y. | U.S. v. Genovese, 05-CR-004 | 24 months custody, 36 months supervision |
| 2006 | N.D. Ohio | U.S. v. Buffin, 06-CR-031 | 24 months probation, $5k fine |
| 2006 | N.D. Ga. | U.S. v. Dimson, et al., 06-CR-313 | Def. #1: 60 months custody, 36 months supervision<br><br>Def. #2: 24 months custody, 36 months supervision<br><br>Def. #3: 96 months custody, 36 months supervision, 80 hours community service |
| 2006 | C.D. Cal. | U.S. v. Gluzman, 06-CR-498 | 24 months custody, 36 months supervision |
| 2006 | S.D. Cal. | U.S. v. Laude, 06-CR-2147 | 36 months probation, $5k fine |
| 2006 | S.D. Cal. | U.S. v. Munoz, 06-CR-831 | 6 months custody, 36 months supervision, $2,500 fine |
| 2006 | E.D. Ark. | U.S. v. Burstein, et al., 06-CR-072 | Def. #1: 24 months probation, $2k fine<br><br>Def. #2: 36 months probation |
| 2007 | D. Md. | U.S. v. Wilkinson, 07-CR-570-2 | 36 months probation, $20k fine |
| 2007 | S.D. Cal. | U.S. v. Norris, 07-CR-2913-1 | 36 months probation, $5k fine |
| 2007 | D. N.J. | U.S. v. Ribeiro, 07-CR-492 | 14 months custody, 24 months supervision. |
| 2008 | D. Md. | U.S. v. Bittenbender, 08-CR-005 | 36 months probation |

Exhibit 1                                          4

| 2008 | S.D. Tex.  | U.S. v. Zeng, 08-CR-075              | 1 year and 1 day custody, 36 months supervision                      |
|------|-----------|-------------------------------------|----------------------------------------------------------------------|
| 2008 | N.D. Cal. | U.S. v. Malhotra, 08-CR-423         | 5 months custody, 36 months supervision, $3k fine                    |
| 2008 | N.D. Cal. | U.S. v. West, 08-CR-709             | 36 months probation, $5k fine                                        |
| 2008 | N.D. Ohio | U.S. v. Kim, 08-CR-139              | 19 months custody, 36 months supervision, $2k fine                   |
| 2008 | E.D. Cal. | U.S. v. Cotten, 08-CR-042          | 24 months custody, 36 months supervision                             |
| 2008 | E.D. Tenn.| U.S. v. Roberts, et al., 08-CR-175  | Def. #1:  48 months probation<br><br>Def. #2:  48 months probation   |
| 2009 | N.D. Ill. | U.S. v. Lee, 09-CR-290             | 15 months custody, 36 months supervision                             |
| 2009 | E.D. Pa.  | U.S. v. He, 09-CR-424              | 24 months custody, 36 months supervision, $250 fine                  |
| 2009 | E.D. Va.  | U.S. v. Mitchell, 09-CR-425        | 18 months custody, 36 months supervision                             |
| 2010 | W.D. Ky.  | U.S. v. Mulhollen, 10-CR-013       | 1 year and 1 day custody, 24 months supervision                      |
| 2010 | N.D. N.Y. | U.S. v. Jhaveri, 10-CR-523         | Time served (approx. 11 months), 36 months supervision, $5k fine     |
| 2010 | S.D. N.Y. | U.S. v. Agrawal, 10-CR-417         | 36 months custody, 24 months supervision                             |
| 2010 | D. Del.   | U.S. v. Meng, 10-CR-056            | 14 months custody, no supervision                                    |
| 2010 | M.D. Ga.  | U.S. v. Crow, 10-CR-013            | 36 months custody, 36 months supervision, $10k fine                  |
| 2011 | M.D. N.C. | U.S. v. Bastie, 11-CR-218          | 60 months probation                                                  |
| 2011 | N.D. Cal. | U.S. v. Murphy, 11-CR-029          | 36 months probation                                                  |
| 2012 | D. N.J.   | U.S. v. Li, 12-CR-034             | 18 months custody, 24 months supervision                             |

Exhibit 1

| 2012 | S.D. Tex. | U.S. v. Huang, 12-CR-189 | 24 months probation, $500 fine |
|------|-----------|--------------------------|--------------------------------|

Exhibit 1

6

**Exhibit 2:** Lynette Luna, *IDEN's Murky Future*, URGENT COMMUNICATIONS, Jan. 1, 2006






🔊 MY YAHOO!   newsgator   B Bloglines     **ShareThis**   ○comment

## IDEN'S MURKY FUTURE
Jan 1, 2006 12:00 PM, BY LYNNETTE LUNA

A recent report card from the 9/11 Commission confirms what everyone in government already knows: First responders cannot communicate with each other in a situation, and little progress has been made to correct the situation. With new spectrum for first responders not becoming available until 2009 and a much-needed technology overhaul of public-safety communications infrastructure currently stalled by a dearth of funds, an alternative seems obvious to many: Sprint Nextel's iDEN network.

With the merger between Sprint and Nextel, the combined company has made its CDMA network a priority, while the iDEN (integrated dispatch enhanced network) system, used by many public-safety agencies nationwide, appears to be an asset Sprint Nextel would be willing to give up.

"It's a fantastic way to get rid of something that in essence is going to be shut down," said Joe Nordgaard, president of consultancy firm Spectral Advantage. "The iDEN network has its merits. In the age of homeland security, it's not a far-fetched idea."

Indeed, rumors have surfaced in recent months that indicate the Department of Defense wants to buy Sprint Nextel's iDEN network as the first phase of a nationwide overhaul of its communications security framework. Reports also have indicated that the federal government would like to move much of its wireless communications onto the encrypted iDEN network, and Sprint customers will be issued dual-network CDMA/iDEN handsets so that as iDEN becomes restricted, CDMA will take its place.

Last June, then Nextel President and CEO Tim Donahue said he believed the iDEN network could be part of the "public-safety network of the future," playing a key role in another national project, known as the Integrated Wireless Network (IWN) — a massive project that would divide the country into 19 zones and overlay a VHF trunked radio system in six phases over a 10-year period (*MRT*, July 2005).

Post merger, Sprint Nextel is keeping mum on the prospect, saying only that mandates from the carrier's senior leadership call for technology innovation for both networks with a focus on making sure the combined networks are able to have similar products and services and offer subscribers combined iDEN/CDMA handsets.

Sprint Nextel has aggressive plans to migrate iDEN users to the CDMA network in 2008, when the next revision of EV-DO technology is commercially available. The new standard, known as EV-DO Rev. A, supports quality of service and includes a larger reverse link to support high-quality push-to-talk (P2T) service. However, the carrier has indicated it also plans to operate and invest in the iDEN network through at least 2010.

## MAKING INROADS

Sprint Nextel is becoming more entrenched in the public-safety arena, which might bode well for a transition of the network to first responders. It is well documented that many public-safety agencies are using Nextel's Direct Connect network as a secondary or parallel means of communication for logistics and non-mission-critical operations. In some cases, the carrier's P2T network is the primary communications system for some small public-safety agencies and military posts.

Sprint also has focused heavily on the first responder sector, creating emergency response team (ERT) reservists nationwide to respond to disasters. As part of the reserve program, the carrier has put employees into emergency operations centers (EOC) across the country and hardened many sites to provide better redundancy. In the southern U.S. alone, Sprint has 512 emergency centers where the carrier is training people and hardening networks, said Matt Foosaner, ERT director.

"If you are going to step into the public-safety space, you have to make the commitment and restore operations as well as have a flexible model to meet that," Foosaner said. "We provide interoperability and a force multiplier. We can scale."

During the response to Hurricane Katrina, Foosaner said Sprint Nextel deployed 7600 handsets to military, local and civilian users and received a waiver from the FCC to use more than its allotted frequencies.

"It was rapid because we can throw a lot of equipment out there," Foosaner said. "Even in areas where iDEN wasn't restored, we have a direct-talk horizontal and vertical capability."

Sprint Nextel also has replaced entire land mobile radio (LMR) systems, although the company purports that such activity generally is an aberration. Because of narrow-banding rules, some domestic military bases ceased using their old analog LMR systems and opted to use Nextel as the primary radio system.

Local public-safety agencies are under increasing pressure from elected officials to simply use

## RESOURCES

NEWSLETTERS    WHITE PAPERS    BUYERS GUIDE    IWCE 2013

**Subscribe to *Urgent Communications* today!**

advertisement



**True Choice in Land Mobile Radio**

## Most Popular Articles

**FirstNet board members revealed**
**Time is ripe for reconsideration of 700 MHz narrowbanding**
**What to expect in the U.S.-Mexico rebanding rulemaking**
**RFID's surprising evolution**
**Strength in unity: Regional planning for public safety communications**

 **Urgent Communications** on Facebook

Like   221

### August Web Poll

**What do you see as the biggest hurdle to interoperability?**

○ Funding
○ LTE migration
○ Political will
○ Technology
○ User desire

Submit

*Check for final results in a future issue of* Urgent Communications.

advertisement
REGISTER FOR FREE!

commercial services like Sprint Nextel's P2T rather than budget for expensive LMR systems. A handful of the nation's local jurisdictions, such as the fire department in Wilson, N.C., are relying more heavily on the carrier's services, and Sprint Nextel has obliged by installing backup generators and hardening tower sites to make them more resistant to natural disasters. The carrier's iDEN network is simply cheaper than building out an LMR system.

## UPGRADES STILL NEEDED

Yet Sprint Nextel's iDEN network needs quite a bit of overhaul before it can serve the needs of first responders as a primary system. Many public-safety users today are concerned about the positioning of iDEN as a primary system — or even as a backup for that matter — because it lacks many features on which public safety relies.

As a result, the International Association of Fire Chiefs came under fire last year for promoting the use of Direct Connect as an effective method to achieve interoperable communications, despite the fact that the IAFC did not endorse the service as a replacement for a primary LMR system.

"iDEN is really good, but we are talking about some significant changes. iDEN was never designed as a public-safety solution," said Fred Wright, senior vice president and general manager responsible for iDEN infrastructure with Motorola, the company that invented iDEN.

Providing backup power to every site would be the biggest cost item. Since iDEN operates at low power, the technology requires significantly more sites than the handful of sites used in today's LMR networks. Hurricanes that have battered the Southeast show the vulnerability of Sprint Nextel's iDEN system today.

While virtually all communications were knocked out in the wake of Katrina, redundant public-safety trunked networks have a significantly better track record compared with commercial carrier networks. And coverage of the iDEN network would need to be significantly enhanced to provide communications in remote areas.

Wright also cited a plethora of software enhancements the iDEN network would need in order to serve public safety. While iDEN has the fastest call set-up time in the commercial P2T world, it still is no match for public-safety networks. That is a software enhancement on which the carrier is working, Sprint Nextel's Foosaner said.

In addition, iDEN technology can't support the same group-call functionality available on first-responder networks. Rather than waiting until all members of the group can hear the message, iDEN automatically connects a call when just one member of the group is available, making it impossible to know whether other members of the group are listening and whether they received the critical message.

## THE NEXT GENERATION

Wright said Motorola has yet to calculate what it would cost to make iDEN public safety-ready, but said it would be "significant." Nevertheless, he said iDEN would make a "great backup for interoperability." Indeed, many federal agencies already use iDEN as a preferred secondary network for interoperability, which could continue under government ownership while the network becomes enhanced.

In addition, Motorola says it is committed to supporting iDEN for "many years," Wright said, regardless of what Sprint does with the network. The vendor supports about 5 million other users in more than 20 countries. "We have to continue developing features," he said.

Consequently, Motorola has developed a software upgrade to iDEN known as wideband iDEN, or WiDEN, that allows compatible subscriber units to communicate across four 25 kHz channels combined, for up to 100 kb/s of bandwidth, offering data speeds between 40 Mb/s and 80 Mb/s, comparable to 2.5G cellular technology.

Prior to the merger, WiDEN originally was expected to be the major stepping stone to a next-generation high-speed data network for AT&T's affiliates, but now Sprint says it is still reviewing whether it will deploy WiDEN. Motorola already has released WiDEN-compatible devices, PCMCIA integrated circuit cards and handsets. While WiDEN is built into the Motorola i850 and i760 codeplug, Sprint has not enabled the feature.

Although WiDEN's data speeds are better than what can be accomplished on public-safety LMR systems, WiDEN can't become the broadband wireless network public safety desires to transmit critical data — such as maps and location-based information — because the platform's foundation is based on narrowband channels. As a result, major design changes would be required to deliver significantly increased bandwidth.

"There are no plans for higher speeds beyond WiDEN," Motorola's Wright said. "We were able to group channels four at a time to increase the data rates to get comparable speeds to GPRS and [CDMA] 1x without major design changes to the technology."

Sprint Nextel's Foosaner said Sprint and Nextel combined their IWN contract bids after the merger to include both iDEN and EV-DO high-speed data technology. "It's recognition that we already have 50,000-plus federal users on iDEN, not to mention how many other CDMA users. There is a real pent-up demand for EV-DO data capability. … First responders need more than voice."

Foosaner envisions a powerful combination of iDEN, EV-DO, whatever technology the operator deploys in the 2.5 GHz band and Sprint's IP backbone network converging to work for public safety.

"Sprint has one of the premier IP networks in the world, and we can take a creative private-sector product development and work it tightly in with public safety for services such as international push-to-talk and dynamic groups," he said. "There are already gateways today between iDEN and LMR systems."

Although Sprint says it will offer a combined iDEN/CDMA handset, Motorola says it has not made a final commitment to building them. Concerns over market size for such a device could prevent Motorola from taking the plunge. Compounding matters for Sprint is that there currently aren't many options beyond Motorola, as no other handset vendor thus far has tried to build an iDEN handset.



### Hot Spots

Project 25
Interoperability
Rebanding
PSAP

- People
- Recent
- Popular
Recent Comments
- **Christal Smith**
Really looking forward to hearing more. Most "lessons learned" aren't as poignant or descriptive. I will be saving this post in my archives!

*Some things you can't prepare for — but you have to try (with related video)* · 22 hours ago

- **DF**
911TM....it's like no one has even seen or heard of them. They have been providing silent instant messaging coverage for the entire U.S. since July. The 5 W's are provided within seconds of the...

*A common-sense approach to 911 texting* · 1 day ago

- **Jonathan Bacon**
WolleySegap, First, sorry for not getting back to your comment sooner. It's a fair question given that there is a lot of confusion on the issue you raised. So much so that last year the FCC issued...

*Appreciation takes many forms* · 1 day ago

community on **DISQUS**

USED EQUIPMENT - BUY, SELL, SAVE!



Motorola X9000/Other Two-Way Radios (Qty 5 Pallets) ; Tag# S-028



Jon Boat With Trailer And Johnson 30 Motor, INV ID: 35044



2006 Ford Crown Victoria; 547, INV ID: 34072

**CURRENT BIDS & MORE LOTS**

**UNANSWERED QUESTIONS ABOUND**

Regardless of how the evolution of iDEN plays out, the entire prospect of the government buying the network likely would be problematic should Sprint get spectrum in the 700 MHz and 800 MHz bands in return, which some reports have speculated. History suggests that competing carriers such as Verizon Wireless would strongly oppose a government swap of this valuable spectrum.

Also, prior to merging with Sprint, Nextel told *MRT* it was interested in moving deeper into the mission-critical communications arena. However, the carrier indicated at the time that such a move must involve more of a private/public partnership to subsidize the expense of adding extra capacity and hardening cell sites. When asked if Sprint would consider such a scenario, Foosaner was noncommittal.

There are many unanswered questions when it comes to a private/public partnership, the answers to which may require new government regulations. For instance, what does each side contribute? How much control would public-safety entities have in terms of defining requirements and maintaining or repairing the system? How would Sprint meet government security requirements? And which is liable should something go wrong with the system?

Nevertheless, the pressure is on to find a solution to radio interoperability problems that continue to plague first responders. The 9/11 Commission gave the government an F grade because Congress still hasn't helped police and firefighters communicate with each other in a disaster. The problem was highlighted with the World Trade Center bombings and the 9/11 attacks, and it was highlighted again during Hurricane Katrina months ago.

Said 9/11 Commission Chairman Thomas Kean and Vice Chairman Lee Hamilton in releasing the report: "It's scandalous that police and firefighters in large cities still cannot communicate reliably in a major crisis."

## THE PROS & CONS OF PARTNERING WITH SPRINT NEXTEL

### + PROS:

High-speed data capability

No upfront costs to build out network

No regular maintenance requirements

Service available in most areas nationwide

### - CONS:

Users must pay monthly charges

Unknown network capacity for first-responder services during crisis (although some operators have implemented priority access)

No quality-of-service guarantee for repairs without special contractual agreements

Coverage in rural areas is questionable

Want to use this article? Click here for options!
© 2012 Penton Media, Inc.

---

**Comments**
Acceptable Use Policy

0 comments

| 0 Stars | ▾ |

Leave a message...

Discussion  ▾    Community

**Exhibit 3:** Zhao Hejuan and Zhang Yuhze, *China's Telecoms and Wireless Drums for Africa*, CAIXIN ONLINE, Feb. 22, 2012

 

**By correspondent Zhao Hejuan in South Africa, Ethiopia and Nigeria, and staff
reporter Zhang Yuzhe** 02.22.2012 15:57

# China's Telecoms and Wireless Drums for Africa

Backed by sometimes controversial government loans, Huawei and ZTE have fueled
mobile communications in Africa



Africa surpassed North America to become the world's second-largest market for
mobile phone telecoms last year in terms of subscriber numbers, and trails only the
Asia-Pacific region.

Reasons for the boom are easily grasped in Ethiopia, Nigeria and other countries across
the continent where communicating mobile device has exploded.

"Five years ago, I was the only one with a mobile phone in my family," said a worker
for Ethiopia National Telecommunications Corp. (ETC) in Nazereth who asked not to
be identified. "Now, everyone in my family, including my two children and aged father,
uses a cell phone.

"Do you know why? China. China!"

The ascent of the African mobile market was described in a 2011 research report by
London-based Informa Telecoms and Media. Matthew Reed, a contributor as head of
the firm's Middle East and Africa research department, predicted more high-speed
growth for Africa's telecom industry, whose individual mobile clients could exceed 1
billion by 2016.

Interviews over a month-long period with industry officials and consumers in three
countries underscored the central role of Chinese telecom companies in fueling the

African market's rapid growth.

Caixin learned during stops in Ethiopia, one of the continent's poorest nations, as well as its most populous land Nigeria and wealthy South Africa that Chinese telecom equipment makers Huawei Technologies and ZTE Corp. have built successful businesses in these countries by combining inexpensive phones for consumers, flexible service and inclusive contracts with domestic telecom providers.

And there's another reason why Chinese telecoms have succeeded in Africa: Loans backed by the Beijing government.

Huawei and ZTE have received substantial financial support in recent years from policy banks, namely China Development Bank and the Export-Import Bank of China, for their African expansions.

In many ways, policy lending has been a two-edged sword for the Chinese telecoms. They've profited by winning over consumers with affordable products and services. On the other hand, they've angered industry competitors including African companies whose governments can't afford to write low-cost loans.

The Chinese companies broke the monopoly-like grips of western telecoms that used to dominate in many African countries, said Daouda Cisse, a researcher at South Africa's Stellenbosch University China Research Center.

But in doing so some say they re-monopolized the sector in target countries by leveraging easy access to government loans and blocking financially inferior, domestic information and telecom technology companies. As a result, Cisse said, telecom companies in Nigeria, Kenya and Senegal have stepped up complaints about Chinese firms such as Huawei and ZTE.

"Chinese investment and Beijing's preferential policies are welcomed by governments most of the time," Cisse said. "African governments are also eager for rapid economic growth.

"But among common business people, Chinese investment is not so popular."

## Signals in Ethiopia

Just six years ago, Ethiopia was a battleground for telecom equipment suppliers. Telefonaktiebolaget LM Ericsson, Nokia Corp. and Siemens AG were among the western players. ZTE and Huawei were the Chinese contenders.

The battle was for a market comprised of fewer than 700,000 mobile phone users. And despite competition, telecom service prices were steep.

"Back then, a SIM card could go for up to US$ 100 on the black market," Zhang Jinbao, director of ZTE's technology center in Ethiopia, told Caixin. "You might not have been able to buy one even if you had the money."

Changes began after the Ethiopian government embarked on a modernization project and sought bids from companies that could build a nationwide mobile network through government-owned ETC, the country's only carrier. Western and Chinese companies participated in the tender, which ZTE won.

Tipping the scale in ZTE's favor was CDB financial support for ETC. ZTE signed a four-year contract to build a backbone mobile phone network in 2006, and a year later

CDB handed ETC a 13-year, US$ 1.5 billion loan to finance the project.

By the end of 2010, Ethiopia had 12 million mobile phone customers.

The tight money environment for western telecoms after the 2008 global financial crisis helped their Chinese competitors strengthen positions in Africa.

For example, ZTE won a major contract in Nigeria in December 2010, after which Exim Bank wrote a US$ 900 million loan to the Abuja government. The money helped finance the Nigerian National Public Safety Communications System's order for US$ 400 million worth of ZTE equipment.

In 2009, Huawei's five-year, US$ 10 billion credit agreement with CDB ended. The next five-year line of credit was US$ 30 billion. That same year, CDB and ZTE signed a five-year, US$ 15 billion financing agreement for the company's overseas customers, and Exim Bank extended it a five-year, US$ 10 billion line of credit.

African governments have watched the Chinese economy strengthen in recent years while "the European and U.S. economies have been mired in distress," said Cisse. And access to Chinese loans "has become very favorable" in the eyes of these telecom equipment and network shoppers.

But rival telecoms have objected to the Chinese financial strategy.

"Export credit programs are everywhere," Adolfo Hernandez, Alcatel-Lucent president for Europe, Middle East and Africa, once said. "Export credit from China is different because it is very large."

The kind of policy lending that's been used in Africa has led to costly legal disputes for Chinese telecoms in Europe. In January 2010, for example, Huawei paid 27 million euros to the Belgian company Option NV for a settlement of an anti-dumping complaint over wireless modems.

Option cited a US$ 30 billion CDB line of credit to Huawei, at a time when Huawei's annual revenue was only US$ 22 billion.

"This form of financial support cannot be obtained from the market," Option had claimed. "Policy advantages are an important reason why Chinese companies have better prices."

Huawei Vice President Hu Houkun that same year defended the lending, noting his company's clients have borrowed about US$ 10 billion from CDB since 2004.

A source at the Bank of China International Settlement Department, which has counted ZTE and Huawei as customers for more than a decade, said the complaints are unfounded.

"In the past, Chinese companies bought foreign products including those from the United States, Japan and Europe, and these countries provided credit to Chinese buyers of their products," the source said. "It's because foreign products are not competitive and price-performance ratios are low that they are looking for reasons to criticize China."

China is indeed playing by World Trade Organization (WTO) rules, said a source at Exim Bank's International Business Department, and has never been formally accused by other WTO members of competing unfairly in Africa.

## Price Pillar

Pricing has been another pillar of support for Chinese telecom equipment manufacturers competing in Africa.

Huawei broke in by offering products for 5 to 15 percent less than Ericsson and Nokia Siemens. Then Huawei had to get more competitive when a new low-cost leader from China – ZTE – entered the African market.

Fan Hu, director of ZTE South Africa's No. 2 Office, said a "price war" broke out in African nations between Huawei and ZTE. Thus, Huawei and ZTE wound up competing against each other even more so than against non-Chinese counterparts.

Birtukan Girnna, director of the Private Company Department at the Ethiopian Ministry of Telecommunications, said ZTE and Huawei have been "competing anywhere there are people" in Africa.

Each company builds mobile phone networks, provides Internet services and manufactures a variety of consumer items from handsets to wireless data cards.

Indeed, the Chinese companies meet specific African telecom carrier demands as all-in-one suppliers. They can package engineering, tower and base station construction, and network equipment supplies into a single contract. They can also tap a deep well of subcontractors to handle work in the field, which in Africa can be rugged.

"The poorer the place, the more things a supplier needs to handle," explained Chen Qiaofang, ZTE's chief engineer in Ethiopia's mountainous Awassa region.

ZTE and Huawei control much of the world's data card market, including Africa's, according to a survey by Danish consultancy Mobilethink Analytics. About 25 percent of the mobile phones sold in Africa come from these companies, the survey said, putting the Chinese in second place behind Nokia. They may get even stronger.

"In the future, the Africa market will be controlled by two Chinese companies plus one western company – Huawei, ZTE, and Ericsson," predicted Dennis Abella, vice president of the South African mobile operator CELL-C. "Nokia Siemens' decline is clear."

Chinese companies have also earned unique reputations for accepting and meeting challenges in corners of Africa where western companies refuse to tread, said Abella. A Chinese subcontractor for ZTE said the more remote the place in Africa, the more likely one will find Chinese telecom workers.

Zhang Yanmeng, ZTE's president in Ethiopia, told Caixin that Ethiopia's complex geography and incomplete public infrastructure make construction work difficult.

"Everyone is always sprinting," he said. "Many front-line engineers have used helicopters to get up mountains, and donkeys as well."

The Chinese companies have been willing to join the sprint even when faced with mountain-like obstacles. They plan to stay in Africa, and win the race.

Print

本文网址: **http://english.caixin.com/2012-02-22/100359637_all.html**

**Exhibit 4:**    **Summer 2012 Letter from Zhengquian Jin (with translation)**

Dear Respectful Judge Castillo,

I am the third brother of Hanjuan Jin, the defendant in the U.S. versus Hanjuan Jin, 08CR192 case. As the case comes to the final crucial stage, please allow me to write this letter to you, representing the whole family who are at the other side of the ocean, expressing our concern and plead.

Our family lives in the countryside of Anhui province, a region at the central part of China, and is one of the millions of ordinary families in China. Our parents raised five kids and Hanjuan is the only girl in the family. Eight members of the family (including our aunt) had been living together for over twenty years. During those years we endured a lot and tried hard to survive, we lived a poor but fulfilling life. When we were still little kids our parents were very strict to us, they showed great example for us and educated us to be honest, caring and hard-working people. Five of us kids took care of each other, we worked and studied hard, enjoyed our time together as little kids and young adults. We miss and treasure the time we spent together. Now we have grown up to be responsible adults and started our own families. We have all become responsible, hard-working, simple and caring adults, and this is all because of the education and discipline we received from our parents and the caring and helpful nurturing among the brothers and sisters.

Hanjuan is the youngest daughter in the family. She has been always a very mature, caring little girl. She paid respect to her parents and her teachers and is a good natured kid. She is a mellow girl in parents' eyes and a good sister among the brothers. We all love her dearly. She is smart and hard-working. She has always been a A+ student at school, got admitted into the best high school in our hometown, and excelled academically and was well respected by her peers. She received great education from one of the top universities in China and is well praised in our hometown. We are extremely proud of her.

Pursuing her dream for a more civilized society and higher education, and looking forward to a better life, Hanjuan left her parents, husband and family behind, and went to study in America. She endured a lot during those years when she was alone on her own in the U.S. Although she enjoyed the beautiful sunshine in the country and her knowledge and experience were enriched, the difficulties she had to overcome are unbelievable. All she left for the family is endless caring and worrying.

In February 2007, we can't believe that bad luck came upon our sister. We were shocked to hear the accusation against my sister and we can't accept the brutal reality. Our life together with Hanjuan made us the best witness for her personal integrity. Her kindness and down-to-earth personality make us believe that she is loyal to the United States of America and she won't do anything to harm the country. We believe that she is also loyal to her company and she won't do anything that damage the company's reputation. She lives in a very simple social circle; she is merely a technical engineer. She contributed all her time and energy to the technical development aspect of her work, and doesn't have any other suspicious personal interests. We believe that the documents she got from the company were for her personal use at work and intended to be used as reference. The reason that she made such a silly mistake is because she lacks legal and confidentiality knowledge. She violated the law simply because of that. She has paid a severe price for that.

We can't believe how a little woman like that handled all the hurdles of separation from the husband, legal dispute and unforeseeable misfortune like this, she has lost all her belongs and is going through lots of difficulties. What we can only do, as the family, is simply show our endless love and support, and we can't help her much at all, all we can give her is our love and encouragement. Without us, I don't think she could have survived. Our father passed away a long time ago, our mother is already over 70 years old. She has suffered from diabetes for a long time and her health is in terrible shape. She hasn't seen her daughter for a long time and is missing her deeply; she wishes her daughter can come home soon. The whole family is missing our little sister dearly.

We were looking forward to a winning verdict on February 8, but what we got is the guilty verdict. We were very disappointed by the verdict, but we believe the justice will win. God loves everyone on earth and he allows people to make mistakes, his love allows people to make unintentional mistakes and he also forgives people that make mistakes because of their lack of knowledge.

Dear respectful judge, the law can be ruthless but people are merciful, we, the whole family, at the other side of the ocean, are waiting for your merciful and fair judgment.

尊敬的 Castillo 法官：

我是 U.S. v. Hanjuan Jin, 08 CR 192 案中金寒涓的三哥，在案件最后紧要关头请允许我冒昧给您写信，代表我们全家在大洋彼岸向你表述我们对案件的关切及诉求。

我们家在中国中东部安徽省的一个农村，是中国最普通的千千万万家庭之一。父母共生养我们兄妹五人，金寒涓是我们唯一的小妹。我们一家8口人（包括小姨）共同生活二十余载，同艰苦，共患难，共同打拼，攻坚克难，度过清贫而充满温暖生活。从小起父母对我们教育很严，他们言传身教，躬身历行，一直要求我们诚实守信，团结互爱，勤奋节俭。我们兄妹五人互相关爱，勤奋学习，享受生活，在愉快地度过我们青少年，我们非常怀念我们曾经的生活，也倍加珍惜我们在一起生活的情感。现在我们都已走向社会，各自成家，我们都能够尽职尽责，勤奋工作，遵纪守法，为家庭为社会做出自己的贡献，做到了合格的公民，也得到单位和社会认可。我们今天之所以能够安身立命，完全得益我们家的踏实、勤奋，简朴，互爱的家风，得益于父母的教育，得益于我们兄妹的互爱互助；

金寒涓是我们最小的妹妹，自小就很懂事，孝顺父母，尊敬师长，敦厚朴实。是族人眼中的好孩子，父母掌中的乖女儿，兄长心中的好妹妹；我们都很爱她。她聪明好学，勤奋刻苦，在小学成绩一直名列前茅，考上了我们家乡最好高中，一直都是品学兼优，得到同学的羡慕与尊重；同时也受到中国最好的大学良好的教育，得到家族及社会的称赞与好评。她是我们家乃至家族最引以自豪的人。

怀着文明社会的向往，带着对知识的追求，美好生活憧憬，妹妹远离父母、丈夫和亲人前往美国求学的。十多年只身一人的打拼，虽然享受到了文明社会的阳光，充实了自己的知识与才干，也付出了经历的是常人难以想象的磨练和磨难，而留给我们的家人是牵挂，亲人无限的思念。

07年2月，我们怎么也不敢相信厄运降临到我妹妹身上，当我们听到这不幸消息时我们家人和族人都感到震惊，如雷轰顶，我们都无法接受无情的事实。几十年的生活我们对妹妹最了解也最有发言权，她的单纯、善良、淳朴使我们相信她对美利坚是无限忠诚的，决不会做损坏国家利益的事情；我们相信她对服务的公司是尽职尽责，倾力奉献，决不有意做有害公司发展事情；她人际关系简单，只是一个技术工程师，她把全部心血与精力用于技术研究，没有其它不良爱好。同时我们坚信她从公司获取的资料都是自己工作接触资料，也只是用于自己研究时参考，就是因为平时对法律及保密知识学习的少，了解少而触犯了法律，而毁掉了一生的前途，为此付出了惨痛的代价。

我们无法想象对于孤身一人的一个弱小的女子，是如何经历住生生死死考验，夫离子散，牢狱之灾，不白之冤；倾家荡产一道道人生难关。我们远隔大洋只有无限牵挂，爱莫能助，给她的只是我们全家的鼓励与关爱，可以想象没有我们亲情支持，恐怕她也坚持不到今天，人生早已结束。我父亲已去世多年，母亲已70多岁，身患20多年糖尿病，体弱多病，多年未见女儿，日夜思恋自己女儿，呼唤着女儿快点回来，所有亲人都思念、想念、挂念我们的妹妹。

度过无数个日日夜夜牵挂，我们期待着2月8日的无罪审判，得到的是有罪判决，我们都很失望，但我们相信法律的公正。上帝是爱每个人，上帝也是允

许人犯错的，他的慈爱对无意犯错是可以谅解的。他会饶恕对无知做出的错误行为。

尊敬的法官大人，法律无情人有情，我们全家人在大洋彼岸期盼您仁慈的、智慧的量刑。

金寒涓的全体家人

二〇一二年四月二十日

Exhibit 5:     Jamil Anderlini, *China to enact new secret detention law*, FINANCIAL TIMES, Mar. 3, 2012

# FINANCIAL TIMES

Welcome to FT.com, the global source of business news and analysis. Register now to receive 8 free articles per month.

March 13, 2012 1:47 pm

# China to enact new secret detention law

By Jamil Anderlini in Beijing

Dissidents and foreign businesspeople will be far more likely to be secretly detained in China if new provisions in criminal procedure law are adopted as expected, human rights groups warned on Tuesday.

The first revision to China's criminal procedure law since 1996 would make it legal for police to detain suspects secretly and outside the formal detention system for up to six months if they have been accused of crimes related to terrorism, national security or "major bribery".

The revised law is expected to be approved by China's rubber stamp parliament, the National People's Congress, on Wednesday.

"This law reflects the rising influence of the security apparatus in China as it gives police and state security agents sweeping powers to detain people for up to six months wherever they please," said Nicholas Bequelin, a senior researcher at Human Rights Watch. "This will be the new regime for dissidents but it also has major implications for foreign businesspeople who fall foul of powerful interest groups."

The Chinese government has heralded the revised law as a great leap in the protection of human rights. And it includes a number of provisions that could strengthen procedural protections for ordinary criminal suspects, especially juvenile and mentally ill defendants, if they are actually implemented.

But the most common charges laid against foreign businesspeople in China are bribery and theft of "state secrets", an ill-defined catch-all phrase that is sometimes applied to publicly available documents and ordinary paperwork from state-owned enterprises. Stealing or revealing state secrets constitutes a national security crime.

The arrest and sentencing in 2010 of Rio Tinto executive and Australian citizen Stern Hu involved state secrets charges related to iron ore sales contracts.

The same year, naturalised American citizen Xue Feng was sentenced to eight years' imprisonment for "gathering intelligence" and "unlawfully sending state secrets abroad" after helping his US employer buy a commercial database on Chinese oil resources.

Before his sentence, Mr Xue, a University of Chicago PhD in geology, was held for months in secret detention facilities by the Ministry of State Security, an institution modelled on the Soviet KGB. He was tortured and denied access to a lawyer for more than a year and his eventual trial was a "farce" by international standards, according to Professor Jerome Cohen, a prominent human rights lawyer who worked on the case.

Once the newly revised legislation is passed, such detentions will be formally enshrined in Chinese law.

Even though incommunicado detention in undisclosed locations for up to six months will be legalised and so theoretically might be challenged in court, rights groups say the ability for families and suspects do so will be severely curtailed.

China's court system is controlled directly by the Communist party, there are no independent judicial bodies to appeal to and detained suspects will not be able to contact family, lawyers or others who could appeal their case.

It will be tempered only by a clause that requires police to notify family members of the detention, but not the location, within 24 hours unless this is "impossible" – something they can easily argue if the person's family lives overseas.

Political dissidents and activists are frequently convicted and given lengthy jail terms for "inciting subversion", placing them in a category of "criminals" who police will be allowed to detain in undisclosed locations for up to six months without access to lawyers or any other visitors.

Many government critics, including the artist Ai Weiwei, Nobel Peace Prize laureate Liu Xiaobo and human rights lawyer Gao Zhisheng, have been "disappeared" by police and state security agents in recent years and held incommunicado in secret detention centres.

"Criminal suspects in China are always at great risk of torture," said Catherine Baber, deputy director of Asia Pacific for Amnesty International. "Holding them outside formal places of detention puts them in even greater danger."

**Printed from:** http://www.ft.com/cms/s/0/ee2bf9e0-6cf7-11e1-ab1a-00144feab49a.html

Print a single copy of this article for personal use. Contact us if you wish to print more to distribute to others.

© **THE FINANCIAL TIMES LTD 2012** FT and 'Financial Times' are trademarks of The Financial Times Ltd.

Exhibit 6:    ***China: Amendment of Criminal Procedure Law***, Library of Congress, last updated: Apr. 9, 2012

# Library of Congress
## Law Library of Congress

# China: Amendment of Criminal Procedure Law

News & Events | Webcasts | **Global Legal Monitor** | RSS & Email
Search News | Browse All Topics | Browse All Jurisdictions | GLM RSS | Top Weekly Articles
To link to this article, copy this persistent link:
http://www.loc.gov/lawweb/servlet/lloc_news?disp3_l205403080_text

(Apr 09, 2012) On March 14, 2012, China's National People's Congress (NPC) adopted an amendment to the country's 1979 Criminal Procedure Law. The Law was first extensively revised in 1996; this second revision also affects a large number of articles, and expands the Law from 225 to 290 articles. The newly amended Law will enter in force on January 1, 2013. (Criminal Procedure Law of the People's Republic of China [2012 Amendment] (Complete Text) [in Chinese], CHINA.COM.CN (posted Mar. 18, 2012), .)

**Highlights of the Amended Law**

The following are key features of the revised Law in the view of some members of the NPC (*Focus on Ten Highlights of the "Great Revision" of the Criminal Procedure Law* [in Chinese], NPC website (Mar. 9, 2012):

- Inclusion of the phrase "respect and protect human rights" as a general principle of the Law (art. 2);
- Restrictions on non-notification of family members, so as "to balance the needs of investigation with criminal suspects' right of family notification" (arts. 83 ¶ 2 & 91 ¶ 2);
- Strengthened protection of the rights of defendants and suspects and augmentation of the adversarial relationship between the defense and the prosecution (arts. 33-36);
- Resolution of three difficulties encountered by lawyers: lack of face-to-face meetings with criminal suspects, need to consult case materials, and problems gathering and obtaining evidence, in part through better integration in the Law of provisions in the Lawyers' Law (arts. 37-40);
- Enhancement of the summary procedures for public prosecutions, by broadening their scope of application; giving the defendant the right to choose whether or not such procedures should be applied; and obligating the people's procuratorate to send personnel to attend court when simplified procedures are used to adjudicate public prosecution cases (arts. 208, 210 ¶ 2, & 211);
- Amplification of procedures for reconciliation to help resolve the difficult problem of execution of civil judgments supplementary to criminal cases (arts. 277-279, in the new Chapter 2, "Procedures for Reconciliation Between Parties in Public Prosecution Cases" of the new Part 5);
- Addition of an article on protective measures for witnesses, victims, or their close relatives whose personal safety is at risk because of their testimony in cases involving, for example, crimes against state security, crimes of terrorism, or organized crime, and of an article on witness compensation for expenses related to testifying (arts. 62 and 63);
- Strengthening of provisions on evidence, especially through the inclusion of an exclusionary rule in non-capital cases, to wit, for example, article 54, which states that confessions or witness statements obtained through torture, extortion, the use of violence, threats, or other illegal means should be excluded. If physical or documentary evidence is collected by illegal means that "severely affect judicial justice," corrections should be made or justifications provided; otherwise, such evidence should be excluded (art. 54, ¶ 1). According to article 58, where evidence is determined through a court hearing to have been obtained illegally or where situations of collecting evidence using illegal means cannot be excluded, such evidence should be excluded. (E-mail from Paul Dalton, Senior Legal Advisor, Danish Institute for Human Rights, to China Law Discussion List, CHINALAW@HERMES.GWU.EDU, of Li Changshuan, Working Translation of Amendments to the Criminal Procedure Law of the People's Republic of China (Mar. 14, 2012) (on file with author).) These measures are seen as instrumental in changing from a situation in which "the confession is king" to one where the relationship between material evidence and oral statements is properly handled, to avert the tendency to completely rely on the latter and neglect the former (*Focus on Ten Highlights of the "Great Revision of the Criminal Procedure Law*, supra);
- Limitation on remands to address the problem of cases repeatedly being sent back and dragged on indefinitely. A new

provision states that when the original people's court has made a decision on a case remanded to it for a new trial, and the defendant files an appeal, "the people's court of second instance should make a judgment or order in accordance with the law and may not remand the case to the original people's court for further trial" (art. 225, ¶ 2) (Li, *supra*); and

- Inclusion of special criminal procedures for juvenile offenders, such as conditional non-prosecution and a sealed criminal record system (Chapter 1, Procedures for Cases of Juvenile Crime, of the new Part 5, arts. 266-276.)

The amended Law also contains expanded provisions on residential surveillance (essentially house arrest) with the addition of four new articles (arts. 72-74 & 76); the new article 76 allows the enforcement authority to impose "electronic monitoring, irregular inspections, and other surveillance measures" on persons under residential surveillance. (Li, *supra*.) The Law also adds a sixth item to the list of restrictions imposed on persons made subject to the measure: the obligation to surrender to the enforcement authority passports or similar documents, identification documents, and driver's licenses (art. 75, ¶ 1, item 6).

### Controversial Sections

As Chinese law expert Stanley Lubman notes, "the amendment does create or modify rules that constitute advances toward legality in the sector of Chinese law that has, up to now, been the most backward of all." (Stanley Lubman, *China's Criminal Procedure Law: Good, Bad and Ugly*, CHINA REALTIME REPORT (Mar. 21, 2012 at 9:11 p.m.) However, he and other commentators have pointed out several aspects of the amended Law that raise concerns. Thus, "At the end of the day, the new law will strengthen the protection of 'ordinary' criminal suspects' rights in a number of significant areas, while at the same time weakening the rights of certain categories of criminal suspects on a scale worthy of a police state." (Bjarne Andreasen & Paul Dalton, *ANALYSIS: China Improves Legal Protection for the Majority and Introduces More Control of the Few*, The Danish Institute for Human Rights website (Mar. 30, 2012).)

First, the procedures on detention of criminal suspects and notification of family members may be problematic. The new article 83, unlike the earlier provision (art. 64), does not contain a clause stating that the authorities must produce a detention warrant, although it states more clearly that the suspect should be placed in a detention facility. The requirement to inform family members within 24 hours of taking a person to custody is retained, as are the exceptions to that rule (where there is no means of notification or where it would "impede the investigation"), but under the new provision there is no requirement to indicate the person's whereabouts to the relatives, although the grounds of "impeding the investigation" are somewhat narrowed to "where crimes endangering state security or crimes of terrorism are suspected" (art. 83).

As Lubman has pointed out, in past practice, despite the law on the books, "the police have caused the 'disappearance' of criminal suspects and activists. In the recent past the police have held dissidents such as Ai Weiwei and human rights lawyer Gao Zhisheng in undeclared locations for months without notifying family members." (*Id.*) Under the amended Law, he adds, "law enforcement agencies would still have the power to detain persons suspected of crimes related to national security or terrorism in a designated location of the agencies' choice for up to six months" and they would "be allowed to deny suspects' access to a lawyer for the duration of the detention." (*Id.*)

Another criticism is that the Law now provides that cases involving trade secrets may be conducted in a closed hearing, should the party apply for it. Lubman notes that the content and scope of the term "trade secrets" is not made clear in the amendment. (*Id.*)

A third source of potential concern is the treatment of the death penalty under the amended Law. While a number of significant positive changes have been made, including "expanded access to legal aid, recorded interrogations, longer trials, mandatory appellate hearings, and more rigorous death penalty review," certain questions remain. (*China's New Criminal Procedure Law: Death Penalty Procedures*, DUI HUA HUMAN RIGHTS JOURNAL (Apr. 3, 2012).) For example, it is unclear whether Supreme People's Court justices will be required to meet defendants in person or if interviews might be remotely arranged with provincial-court officials as proxies. Another question is whether defense lawyers will only be allowed to present written submissions or be guaranteed a face-to-face meeting with the justices and, if the latter, whether there will there be a more formal process than the "petitioner" channel currently in place. (*Id.*)

### Issuance of Companion Rules and Documents for the New Law

In a statement issued on March 22, 2012, the Supreme People's Procuratorate (the highest-level state organ responsible for prosecution) indicated that it plans to draft new rules or modify existing explanatory documents to complement the newly revised Criminal Procedure Law. Among the issues to be addressed are "technological investigative methods, home surveillance for occupational crimes, information sharing and cooperation among procuratorates, courts and detention centers, the exclusion of illegally obtained evidence and simplified court hearing procedures." (*China to Modify More Rules in Line with Criminal Procedure Law Revision*, XINHUA (Mar. 22, 2012).)

- **Author:** Wendy Zeldin More by this author
- **Topic:** Criminal law and procedure More on this topic
- **Jurisdiction:** China More about this jurisdiction

<u>Search Legal News</u>
Find legal news by topic, country, keyword, date, or author.

<u>Global Legal Monitor RSS</u>
Get the Global Legal Monitor delivered to your inbox. Sign up for RSS service.

The Global Legal Monitor is an online publication from the Law Library of Congress covering legal news and developments worldwide. It is updated frequently and draws on information from the Global Legal Information Network, official national legal publications, and reliable press sources. You can find previous news by searching the <u>GLM</u>.

Last updated: 04/09/2012

**Exhibit 7:**       Leslie Hook, *China jails US geologist for 8 years,* FINANCIAL TIMES, July 5, 2010

ft.com/frontpage  UK     All times are London time

# FINANCIAL TIMES

**Welcome to FT.com, the global source of business news and analysis. Register now to receive 8 free articles per month.**

Last updated: July 5, 2010 2:09 pm

# China jails US geologist for 8 years

By Leslie Hook in Hong Kong

An American geologist convicted of stealing secret information about the Chinese oil industry has been sentenced to eight years in prison under China's powerful state secrets law.

In an unusual show of concern US ambassador Jon Huntsman personally attended the verdict hearing on Monday, in which Xue Feng, 44, was also fined 200,000 renminbi ($29,500).

The conviction - which came a year after Mr Xue's trial ended - is seen as a reminder of the legal risks that foreign firms in China face and the opaque nature of state secret legislation.

The case against Mr Xue, stemmed from his attempt to purchase a database about China's oil industry while he was working for the US-based energy consulting firm IHS in 2001, according to San Francisco-based advocacy group The Dui Hua Foundation.

"As I understand it, this database was not classified as a state secret until afterwards," said Joshua Rosenzweig, a senior researcher at Dui Hua. "Under Chinese state secrets laws, we have seen in the past that you can't always go into a transaction knowing beforehand that what you are doing is wrong, because you can't always know what is a state secret."

The Chinese legislation contains broad definitions of what can be classified as a state secret, representing a risk for any company or person seeking to gather information. Australian citizen Stern Hu, an employee of mining giant Rio Tinto, was initially charged with stealing state secrets after his detention in July 2009. The charge was later downgraded to stealing commercial secrets related to iron ore pricing, and Mr Hu was convicted and sentenced to

ten years in jail in March. Journalists and activists have also been charged with stealing state secrets.

New amendments to the state secrets law were approved this spring and will take effect on October 1. The changes make it harder for low-level government officials to classify information as a state secret, and also make Internet and telecom companies responsible for monitoring and reporting state secrets leaks on their networks. However observers say the new law does not fully clarify what can and cannot be classified as a state secret, leaving open the possibility of abuse.

Mr Xue's lawyer Tong Wei declined to discuss the details of the database on the grounds that it was a state secret. Extractive industries traditionally guard scientific information about geological formations and well production very closely. And this spring China announced plans to clamp down on online mapping that might threaten national security.

The US Ambassador on Monday called for Mr Xue's release. "I am disappointed," Mr Huntsman said of the verdict in a statement. "I have been following his case since I got here and have visited with him several times."

US President Barack Obama raised the Xue case with Chinese leaders during his November 2009 visit, according to the Associated Press.

Mr Xue was born in China, earned a doctorate at the University of Chicago and became a US citizen. His detention was kept secret for nearly two years at the request of his wife, and only made public last autumn.

Mr Tong, the lawyer, said he didn't know whether his client would appeal the verdict, adding that they would discuss it during a meeting on Wednesday.

An IHS spokesperson said the company was "extremely disappointed at the news and is very sympathetic to the situation".

"We are continuing to work with our advisors on the issue," he added.

**Printed from:** http://www.ft.com/cms/s/0/87a1bea4-87f6-11df-a4e7-00144feabdc0.html

Print a single copy of this article for personal use. Contact us if you wish to print more or distribute to others.

© **THE FINANCIAL TIMES LTD 2012** FT and 'Financial Times' are trademarks of The Financial Times Ltd.