```
 1              IN THE UNITED STATES DISTRICT COURT
           FOR THE NORTHERN DISTRICT OF ILLINOIS
 2                     EASTERN DIVISION

 3   UNITED STATES OF AMERICA,        )
                                      )
 4                  Plaintiff,        )  Case No. 08 CR 192
                                      )
 5   -vs-                             )  Chicago, Illinois
                                      )  August 29, 2012
 6   HANJUAN JIN,                     )  11:13 a.m.
                                      )
 7                  Defendant.        )

 8
             TRANSCRIPT OF PROCEEDINGS - SENTENCING
 9           BEFORE THE HONORABLE RUBEN CASTILLO

10   APPEARANCES:

11   For the Government:    HON. GARY SHAPIRO
                            UNITED STATES ATTORNEY
12                          BY:  MR. STEVEN J. DOLLEAR
                                 MR. CHRISTOPHER J. STETLER
13                          219 S. Dearborn Street
                            Chicago, IL  60604
14                          (312) 353-5300

15   For the Defendant:     FEDERAL DEFENDER PROGRAM
                            BY:  MR. JOHN F. MURPHY
16                               MS. BETH WESTMAN GAUS
                                 MR. DANIEL P. McLAUGHLIN
17                          55 East Monroe Street, Suite 2800
                            Chicago, IL  60603
18                          (312) 621-8342

19

20

21   Court Reporter:

22              KATHLEEN M. FENNELL, CSR, RMR, FCRR
                     Official Court Reporter
23               United States District Court
            219 South Dearborn Street, Suite 2144-A
24                  Chicago, Illinois  60604
                  Telephone:   (312) 435-5569
25          e-mail:  Kathleen_Fennell@ilnd.uscourts.gov
```

1      (Proceedings heard in open court:)

2          THE CLERK:  08 CR 192, United States versus Hanjuan

3  Jin.

4          MR. DOLLEAR:  Good morning, your Honor.  Steve

5  Dollear and Christopher Stetler on behalf of the United

6  States.  Good morning.

7          MR. STETLER:  Good morning, your Honor.

8          MR. MURPHY:  Good morning, Judge.  John Murphy, Beth

9  Gaus and Daniel McLaughlin on behalf of Hanjuan Jin who's

10  present in court.

11          THE COURT:  Okay.

12          PROBATION OFFICER:  Good morning, your Honor.

13          THE COURT:  Good morning.

14          PROBATION OFFICER:  Todd McKechnie on behalf of the

15  Probation Office.

16          THE COURT:  Okay.  Thank you for being here.

17  Mr. McKechnie, you can be seated.  Ms. Jin can be seated.

18          Are both sides ready to proceed to sentencing?

19          MR. MURPHY:  Yes, Judge.

20          MR. DOLLEAR:  Yes, your Honor.

21          THE COURT:  I will say, for the record, I have read

22  all of the briefs that have been filed even as recently as

23  yesterday and all the submissions as well as the letters that

24  were filed and, Mr. Murphy, thanks for transmitting them over

25  to my chambers on behalf of Ms. Jin.

1          MR. MURPHY:  You're welcome, Judge.

2          THE COURT:  Let me confirm for the record that,

3 Mr. Murphy, you and your co-counsel have read Mr. McKechnie's

4 report.

5          MR. MURPHY:  Yes, we have, Judge.

6          THE COURT:  And have you gone over the report with

7 Ms. Jin?

8          MR. MURPHY:  We have.

9          THE COURT:  Do you have any disputes as to the facts

10 contained in the report?

11         MR. MURPHY:  Not as to the facts, Judge.

12         THE COURT:  Okay.  Any disputes with regard to the

13 facts on the part of the government?

14         MR. DOLLEAR:  There were two material typos, your

15 Honor, that I would like to correct.

16         THE COURT:  Sure.

17         MR. DOLLEAR:  Line 136 of the PSR, your Honor, in

18 reference to the government's loss, intended loss and the

19 PSR's intended loss calculation, it should be 50 million

20 rather than 2.5 million.

21         THE COURT:  So it should be estimated to be between

22 20 million and 50 million?

23         MR. DOLLEAR:  Correct, your Honor.

24         THE COURT:  Okay.  Then we will make that correction,

25 Mr. McKechnie, to Line 136.

1        MR. DOLLEAR:  And, your Honor, I have one more.

2        THE COURT:  Go ahead.

3        MR. DOLLEAR:  Line 161 should read -- I think it

4   currently reads does not recommend a two-level increase.

5   "Not" is a typographical error in the PSR and should be

6   removed.

7        THE COURT:  Okay.  It will be removed.

8        MR. DOLLEAR:  Your Honor, I have an issue that I'd

9   like to address unrelated to the PSR.

10        THE COURT:  Okay.

11        MR. DOLLEAR:  There is a post-trial motion pending

12   which you're aware of.

13        THE COURT:  Sure.

14        MR. DOLLEAR:  And I don't know if you wanted to rule

15   on that before or after.

16        THE COURT:  I do, and I appreciate you bringing that

17   up, but that was next thing I was going to go to.

18        I have read the post-trial motion filed on behalf of

19   Ms. Jin, and for the reasons detailed in my written opinion

20   where I previously ruled on these issues, I will deny the

21   post-trial motion.

22        I conclude that Ms. Jin did receive a fair trial in

23   accordance with the rules of procedure and in accordance with

24   all the legal rulings that I previously made throughout this

25   case, which are well preserved for appeal.

1       MR. DOLLEAR:  Thank you, your Honor.

2       MR. MURPHY:  Thanks, Judge.

3       THE COURT:  Now, let's turn to legal issues because I

4  think there are several, just looking at the submissions.

5       Let's start out with the loss calculation.  I think

6  that's a good place to start.  So do you want to address that?

7       MR. MURPHY:  Yes, Judge.

8       THE COURT:  Okay.

9       MR. MURPHY:  I think sort of as preamble to this,

10  because I think it affects how we have viewed the government's

11  position and the PSR, the filings evince a position from the

12  government that is if -- it is as if the trial never happened

13  or as if the government had gotten convictions on each count

14  and the Court had agreed with the government on each point

15  that the government's put forward in its theory, and the

16  reason I say that is because had that happened, we'd be

17  looking at the same calculations and the same government's

18  sentencing request at this point.

19       THE COURT:  Okay.

20       MR. MURPHY:  With respect to the loss -- and that

21  permeates the government's and distorts the government's view

22  on loss and the other issues here.

23       The government's premise is essentially that the R&D

24  costs for Motorola should be used as the loss calculation.

25  There's no dispute that this is not an actual loss case.  It's

1  an intended loss case in that there was no actual loss.

2  The reality is that that R&D calculation does not

3  reflect the intended loss as the Court found in this case.

4  Regardless of those numbers, the fact of the matter is the

5  Court concluded that Ms. Jin took those documents for her own

6  economic benefit, as the Court said, to prepare herself for

7  her job at Sun Kaisens.

8  The government's argument with respect to R&D is that

9  those documents -- that loss should be considered and the R&D

10  loss should be considered because those documents could have

11  gotten into the hands of somebody who would have then

12  developed iDEN --

13  THE COURT:  Right.

14  MR. MURPHY:  -- without having to use that cost.

15  That's simply not what the Court found.

16  THE COURT:  What's the defense's alternative loss

17  calculation?

18  MR. MURPHY:  Well, as -- our -- our first position

19  would be that we don't think there was a loss, but the reality

20  is understanding the Court's ruling, we would say that in

21  light of the Court's ruling that a potentially appropriate

22  loss calculation would be the -- the salary or benefits she

23  might have received at Sun Kaisens.

24  Now, we don't know what that is precisely because the

25  government has staked its entire loss calculation and the

1   proof it's provided is based on that, and it's obviously the

2   government's burden, but that seems to me the most logical way

3   based on the Court's ruling to look at this.

4          And so it's certainly much more consistent with the

5   Court's ruling than the government's position, which is

6   frankly inconsistent with the Court's ruling, and so that

7   would be our position with respect to that.

8          And I'm sure the government has something to respond

9   to, and I'd like the opportunity to respond to them as well.

10         THE COURT:  Sure.

11         Mr. Dollear?

12         MR. DOLLEAR:  Yeah, Judge, obviously, we disagree and

13  we disagreed in the papers, but just a few points as to what

14  Mr. Murphy just said.

15         As far as what the loss calculation would have been,

16  whether you had found -- the Court had found Ms. Jin guilty of

17  1831 or 1832, the loss calculation would have been the same

18  under the guidelines, and what Mr. -- because what

19  Mr. Murphy's referring to is our premise of the loss

20  calculation, the government didn't make that up or come up

21  with that as some novel idea.  It is embedded in the guideline

22  itself that in the theft of proprietary material, i.e., trade

23  secrets, that the development costs should be -- dictate the

24  loss calculation or the intended loss.

25         So this is well founded in the guidelines, Judge, and

1    the case law that courts would look to even back to the '90s

2    when just after the statute was passed, there's the case out

3    of Texas where research and development costs was used even

4    before it was in the guidelines.

5           THE COURT:  In the year of this offense, this iDEN

6    technology brought in revenues to Motorola of approximately

7    how much?

8           MR. DOLLEAR:  Judge, that is not in the record.  What

9    I can say, if it's okay, is in 2011, what is public is that it

10   was 365 million in revenue in 2011.  That is public

11   information, your Honor.  And what you found in your order

12   throughout the course of the trial and what the testimony

13   supported is that is -- that number went down between 2006 and

14   2007.  So using that as a benchmark, it was higher than 360

15   million in 2006 because 2011 was 365 million.

16          And I'll also offer, Judge, you know, as we pointed

17   out in our papers, you know, this technology the defense has

18   referred to as having no value, in reportings to the SEC,

19   Nextel International has reported that it made $2 billion in a

20   single year based exclusively on iDEN technology, and the

21   reason that they disclosed that to the SEC is they thought it

22   was potentially a risk that if Motorola went out of the iDEN

23   business that their industry and their profits were going to

24   be harmed.

25          So I mean it is big business, your Honor, but the

1  research --

2      THE COURT:  My point is that viewed through that lens

3  of how much revenue this technology brought in, the

4  government's loss calculation seems to be a reasonable

5  calculation.

6      Now, I know you disagree with that, Mr. Murphy.

7      MR. MURPHY:  Well, I guess what I would say, Judge,

8  is, you know, the guidelines, Mr. Dollear makes it sound like

9  the guidelines require the R&D, use of the R&D, and the

10  guidelines, as the Court is well aware, says that you can --

11  that that's a non-exhaustive list of factors the Court can use

12  where it's appropriate and practicable.

13      I mean the fact of the matter is, the Court ruled

14  that there was no evidence of an intention to give it to

15  anyone else.  And so the R&D costs only make sense in the

16  event that you were, A, going to give it to someone else; and,

17  B, that person was going to use it to develop a different --

18  an iDEN technology.

19      It doesn't make sense to use it at that point, and

20  the Court isn't bound to use R&D costs because it's suggested

21  in the application note.

22      And, again, that's -- that's why, while I understand

23  this is a difficult issue to get our hands around, based on

24  the Court's ruling and based on the evidence that was

25  presented, there was no attempt to get this to any third

1  party, and so the R&D course -- R&D losses just are not
2  appropriate --

3       THE COURT:  You say that, you say that, and I know
4  you said before that that I ruled that there was no evidence,
5  I forgot how you phrased it, but I think it's more correct to
6  say that I ruled it wasn't proven beyond a reasonable doubt
7  that Ms. Jin was trying to get this to a third party, and I
8  would just be careful how you phrase it.

9       But to cut through the loss calculation, because I've
10  struggled with this, but the sentencing guidelines are a
11  flexible tool, and according to 2B1.1, the application note C,
12  the Court only need to make a reasonable estimate of the loss,
13  and here we're dealing with intended loss.

14       When I look at what is the public record in terms of
15  the value of iDEN technology, which was somewhat addressed in
16  the Court's opinion, I look at the research costs which were
17  part of the trial record in this case, I will reduce the
18  intended loss to have a value of somewhere between 10 and
19  $15 million.  That is the Court's ruling with regard to what
20  intended loss was, keeping in mind that a loss was not
21  actually suffered.

22       Now, what does that do under the guidelines?  Because
23  I'm not making this ruling to try and fit into a certain level
24  under the guidelines.

25       MR. MURPHY:  Right.

1          I think it changes it from a 22-level enhancement to
2     a 20-level enhancement.
3          THE COURT:  20?  So it's a reduction of two levels,
4     okay.
5          So just as a base point, keeping in mind the
6     guidelines are advisory and we're still just at the very
7     beginning of this sentencing, there's a two-level reduction.
8          Let's go to the next dispute under the initial
9     application of the advisory sentencing guidelines, which would
10    be the enhancement being sought by the government?
11         MR. MURPHY:  That's correct.
12         THE COURT:  Okay.
13         MR. MURPHY:  And I guess that is the enhancement
14    being sought with respect to the acquitted conduct, and that
15    is that Ms. Jin was operating for the benefit of a foreign
16    entity, in this case, the People's Republic of China.
17         THE COURT:  And here we're talking about not only the
18    trial testimony of Shawn Bateman but the affidavit that was
19    tendered by the government, which I've read for purposes of
20    sentencing.
21         MR. MURPHY:  Correct.
22         THE COURT:  Okay.  You can address that.
23         MR. MURPHY:  Judge, very briefly, because I know the
24    Court has read everything and heard all the evidence, the
25    decision to use the acquitted conduct is a pretty significant

1   decision.  The Court heard the evidence and the Court ruled
2   that there was no evidence that she intended to give this --
3   this to Sun Kaisens, that she even knew that she had any
4   connection with the People's Republic of China.

5           Bateman in her trial testimony never opined one way
6   or another about Ms. Jin; and without belaboring the points
7   that we've made, I think the arguments that the government or
8   that the points that Bateman makes in her -- her submission
9   for sentencing are very, very porous and weak and really not
10  something that the Court should use to enhance someone's
11  sentence.

12          There was no evidence that -- there was essentially
13  no evidence that Ms. Jin was using -- having any contact with
14  the People's Republic of China, and the Court ruled that way,
15  and there's nothing that's been presented by the government
16  since that time or was presented at trial which justifies that
17  enhancement.

18          THE COURT:  Okay.  Government?

19          MR. DOLLAR:  As you've already pointed out, Judge,
20  twice when you addressed this in your written opinion, you
21  said beyond a reasonable doubt, but more importantly, Judge,
22  numerous times, at least two that I can think of, when
23  addressing what defendant's intent was you said at a minimum,
24  the government has shown that it was the intent to benefit
25  herself and indirectly benefit Sun Kaisens through her

1   digesting this information and using it at her new employment.

2   Judge, you were setting a floor is how I read that,

3   and, again, it was twice that you referenced at a minimum.

4   And using that as our launching pad that there was an indirect

5   benefit intended for Sun Kaisens and then when you couple in

6   just the last couple weeks that took place before she stole

7   this material, to the government's view, it's inescapable that

8   there was some intent benefited for a foreign government.

9   The idea that she didn't have any ties to a foreign

10  government doesn't hold water, and that's not what you found

11  in your written opinion.  You'll remember she had at least

12  seven classified Chinese military documents on her possession;

13  and if you flip through the 50 pages or more that the defense

14  has filed, have they once addressed why she's got those

15  documents?  No, because it's the elephant in the room, Judge.

16  Why does she have these military documents with her

17  when she comes back to the United States for two weeks?  And

18  the only significant things that happen in those two weeks,

19  Judge, are she takes $30,000 of cash out, she gets sworn in as

20  a U.S. citizen and says that she doesn't have ties to a

21  foreign government when she's got classified Chinese military

22  documents on her and clearly she's already basically accepted

23  a job with a military contractor for the People's Liberation

24  Army, and then what does she do?

25  Well, obviously the cherry on top is she goes back,

1  lies to Motorola five or ten times to get a thousand trade --

2  you know, a thousand proprietary documents.

3      It's inescapable, Judge.  I mean, clearly there was

4  some intent to benefit Sun Kaisens, and she knew very well

5  that Sun Kaisens, who was on the board akin to the 61st

6  Research Institute, was on the same board in making decisions

7  on telecommunications technology, that's the story in this

8  case is that she had all that material.

9      She had it with her when she came to the United

10  States, and she had it on her again when she was trying to go

11  back to China, and there are ample ties between her and the

12  Chinese military, including an e-mail in December of 2006,

13  Judge, as you'll recall in which Liu, the person -- her one of

14  two main contacts at Sun Kaisens sends her an e-mail with an

15  attachment, and the attachment says this one's going to be

16  talked with the 61st Research Institute.  Please familiarize

17  yourself which it.

18      Judge, the inference in that is that she's going to

19  that meeting, and you found beyond a reasonable doubt, it was

20  undisputed, that the 61st Research Institute is under the

21  People's Liberation Army.  It is part and parcel of making

22  telecommunications products for the Chinese military.

23      So the characterization of your rulings that there's

24  no connection between Ms. Jin or her conduct and the Chinese

25  military just doesn't hold up, and it seems to avoid what I

1 think is the most -- one of the most -- two most aggravating
2 facts in this case, Judge, which is she has tons of
3 connections to the Chinese military, and whatever 1832 case
4 they point to, you never have connection to the Chinese
5 military, and that was her career goal.

6 And for that, your Honor, I think by a preponderance,
7 we've demonstrated that the two-level enhancement's
8 appropriate.

9 MR. MURPHY: Judge, if I may, the Court did rule
10 that -- you described the connection between the Chinese
11 military, the PRC and the iDEN technology as a stretch at
12 best. You also said that "the government put forth no
13 evidence that Jin was asked or directed to take the trade
14 secrets. The evidence did not establish that Jin planned to
15 give the trade secrets to Sun Kaisens, let alone the PRC."

16 The government's evidence here, like it has --
17 argument here, like it has been throughout this case from the
18 beginning, is speculation, and that speculation basically
19 doesn't hold up under -- under the bright lights. And the
20 fact of the matter is, there's no justification for giving
21 that enhancement at this point.

22 You know, the government -- one of the facts that the
23 government walks around very carefully is not only is it
24 speculation, but the fact is, Ms. Jin has traveled to China,
25 that's undisputed, and she could have accessed these documents

1 overseas, and she could have given it to somebody else.  There

2 was no forensic evidence, there was no direct evidence of

3 that.  There was no -- the government surveilled, tapped her

4 phone, watched her e-mails.

5         THE COURT:  She could have accessed which documents?

6         MR. MURPHY:  She could have accessed all of these

7 documents that she was charged with remotely, and they --

8         THE COURT:  The Motorola documents?

9         MR. MURPHY:  Yes.

10        THE COURT:  That's what you're referring to?  Okay.

11        MR. McLAUGHLIN:  Yes, your Honor.  At trial, there's

12 testimony from Tom Chmielarski, who was the data --

13        THE COURT:  Right.  I remember that.  I just wanted

14 to clarify which documents you're referring to.

15        MR. MURPHY:  Right.

16        And so, essentially, Judge, in sum, there's --

17 nothing they said is any different than they've already always

18 said and which the government -- which the Court found was not

19 based in the evidence, the Court found that it was really

20 speculation.

21        THE COURT:  Okay.  I know that this is hotly

22 disputed.  I ruled in favor of the defendant applying the

23 beyond-a-reasonable-doubt standard.

24        At this point, I'm going to overrule the objection by

25 the defense because it's a different standard of proof.

1   That's what it really comes down to, a proof of preponderance
2   of the evidence, and the reason for that is very basic.

3         No. 1, I do believe Shawn Bateman gave credible
4   testimony before this Court.  I think I referenced that very
5   carefully in the bench opinion.

6         No. 2, I think it is very significant that the
7   defendant was carrying classified Chinese government
8   documents.  That is not an accident.  No one goes to any
9   website or Internet and just downloads those type of
10  documents.  I think Ms. Bateman referenced that very carefully
11  in her affidavit, and I credit that, that that is not an
12  accident.

13        So then one has to look at, in the entire picture,
14  what was going on here, and I think by a preponderance
15  standard, the fact that Sun Kaisens listed her as an employee,
16  one would really have to have their head in the sand to not
17  know that this could benefit, perhaps not directly, but
18  indirectly the Chinese government.

19        And so for all those reasons, I'm going to overrule
20  the objection to the two-level increase under 2B1.1(b)(5).

21        What's the next issue?

22        MR. DOLLEAR:  Judge, could I just clarify one thing
23  for the record?

24        THE COURT:  Yes.

25        MR. DOLLEAR:  Just so you know, and there's been a

1  lot of materials --

2        THE COURT:  Right.

3        MS. DOLLAR:  -- Ms. Bateman's submission at

4  sentencing is a report versus an affidavit.  She didn't do it

5  under oath, but obviously she drafted that, Judge.

6        THE COURT:  I understand.

7        What's the next issue?

8        MR. MURPHY:  The only other issue that's under

9  debate, and I won't discuss -- I won't spend a lot of time

10  with --

11        THE COURT:  Okay.

12        MR. MURPHY:  -- is we requested a reduction for

13  acceptance of responsibility.

14        THE COURT:  Okay.

15        MR. MURPHY:  The reason being, as the Court is aware,

16  we didn't -- this was essentially a legal defense.  We did not

17  take the approach that she did not take these documents.

18  That's what she was convicted of.  We argued that she

19  should -- the Court -- that these were not trade secrets.

20  Consequently, we don't think --

21        THE COURT:  Cutting through that just for a second.

22        MR. MURPHY:  Sure.

23        THE COURT:  I'm sorry to interrupt you.

24        MR. MURPHY:  No.

25        THE COURT:  Ms. Jin filed a statement, which I've

1  read very carefully.  Is she intending to address the Court

2  any further?

3          MR. MURPHY:  She had about a two-sentence, just sort

4  of comment to make to the Court, but because of the language

5  difficulties and the accent --

6          THE COURT:  Right.

7          MR. MURPHY:  -- it just struck me as easier for the

8  Court to read it rather than to have her read it and try to

9  understand.

10          THE COURT:  Okay.  I know the government objects to

11  the acceptance reduction.

12          Carefully weighing the issues presented at trial by

13  the defense team, the absence of Ms. Jin's testimony and her

14  statement submitted by Mr. Murphy, I will give her acceptance

15  of responsibility.  I do find it's an unusual extraordinary

16  situation, and she will get the two-level reduction for

17  acceptance of responsibility.

18          So at the end of the day, I think we've gone down,

19  what is it, four levels?

20          MR. McLAUGHLIN:  That's correct.

21          MR. MURPHY:  That's correct.

22          THE COURT:  So what is the advisory sentencing

23  guideline range?

24          MR. McLAUGHLIN:  Your Honor, that yields a sentencing

25  guideline range with a total adjusted offense level of 28,

1   which advises a range of 78 to 97 months.

2           THE COURT:  Okay.  With that range in mind, we're

3   going to proceed to sentencing allocution where I determine

4   what is a sufficient but no greater than necessary sentence,

5   and I'll hear first from the government, then I'll hear from

6   the defense.  Then Ms. Jin can exercise her right of

7   allocution, but as I said before, I've already carefully

8   considered her statement.

9           So let's start with the government.

10          MR. DOLLEAR:  Thank you, your Honor.

11          I realize that you've been given a lot of papers

12  certainly by the government in this case.  I know you've

13  reviewed that.  And the government --

14          THE COURT:  That's okay.

15          MR. DOLLEAR:  Thank you, your Honor.

16          I'm not going to restate each and every argument that

17  we had, that we put forth in those submissions.  But, your

18  Honor, with your permission I'd just like to highlight a few

19  factors that I think are very significant in this case.

20          THE COURT:  Go ahead.

21          MR. DOLLEAR:  And as a starting point, your Honor,

22  the government is recommending a sentence of imprisonment

23  between 70 and 96 months.

24          The government has asked for that sentence, which the

25  defense has pointed out is akin to the most severe sentences

1   in an 1832 case, a Section 1832 theft of trade secret case

2   because this case is akin to one of the most severe 1832

3   prosecutions and convictions addressed by federal courts, and

4   that's for a few reasons, your Honor.

5          The first is the sheer volume and value of the

6   material that was stolen.

7          Judge, in this case, the defendant stole thousands of

8   documents related to iDEN.  She did it in a matter of days,

9   and to put that in perspective, and we've talked a little bit

10  about the loss calculation and the value, but the reason that

11  this is valuable, Judge, is because it is a secret.  It's kept

12  only among Motorola employees.  It took Motorola employees

13  20 years and hundreds, thousands of engineers and other

14  employees to develop these documents.  They're living

15  documents.

16         To give you some kind of quantification about how

17  much she took, you saw in the government's version where

18  there's basically four core documents related to the iDEN

19  technology.  There's 300-some total on their system today

20  which is greater than that that was true in 2006, 2007.  She

21  took over half of those core documents, Judge.

22         And the value, and I recognize that you found the

23  value between 10 and $15 million, but really what she did is

24  she stole Motorola's property, and the value of that property,

25  Judge, to develop those 300-plus documents really is 600

1  million plus because -- and that's just for the years 2001 to
2  2006.  If you were to look at Motorola's iDEN research and
3  development costs, it's over $600 million.  It's eye popping.

4  And basically what the defendant did in this case is
5  she took over half of that technology, the core documents,
6  with her to China.  And at that point, your Honor, it would
7  have been her property, not Motorola's property.  And she
8  stole something.  There's no doubt.  This is not an attempt
9  case.

10  She was walking on the jetway and was stopped because
11  she lied, one of many lies that she told, about what she was
12  carrying or, I'm sorry, about the money that she was carrying
13  at that time, and then the documents were discovered.

14  But that's the only thing that prevented this crime
15  from being much worse than it was.

16  And, your Honor, the defense has even today said
17  there's no value to that, but just looking at it in a very
18  common-sense way, Judge, they are in a competitive industry,
19  they being Motorola, and what Ms. -- what the defendant took
20  in this case is Motorola's playbook.  And how somebody, a
21  competitor's playbook, whether that be for the Chinese
22  military or whether that be for Sun Kaisens and the
23  telecommunication industry is not a valuable to a company or a
24  government is inescapable, Judge, and it clearly had
25  significant, significant value.

1    The other factor that really makes this case stand
2    out from other cases is that the defendant's ties to the
3    Chinese military, and I know you've addressed that, Judge, but
4    just to put this, a little bit more context, is that there
5    were classified documents and these are not ones that really
6    took a lot of expert testimony to explain how they were
7    related to the Chinese military.

8    On the face of the document it says classified and
9    drafted by the People's Liberation Army.  And that's
10   undisputed.  And these are not, to be clear, academic
11   documents.  One of the documents, the short message project,
12   and I can certainly give the Court the title, but I know
13   you're familiar with it, talks about how this -- the Chinese
14   military was working on projects to locate targets for their
15   artillery units and how they were going to use the
16   telecommunications products for that purpose.

17   So it's not just, hey, we're sitting in a classroom
18   trying to figure out how a certain telecommunication product
19   works.  It has real applications to their military.

20   And just, again, as far as like the global view of
21   how Congress has viewed this crime as serious, the Center
22   Report talks about it being more damage than an arsonist's
23   torch.  And, your Honor, that really is true in this case.

24   Motorola could have rebuilt a factory for far less
25   than $600 million it cost to create these documents and the

1  time and energy of numerous employees that was required to
2  create these documents.

3         And just to speak to that, there is a human factor to
4  this, too, Judge, that we've talked in our filings about that,
5  you know, this industry, you know, people can talk about a
6  loss, the defense can talk about just a loss to Motorola; but
7  at the end of the day, if the iDEN technology is reduced, jobs
8  are reduced.  We're talking about 900 employees in 2006 when
9  she took all these documents.

10        The second factor under 3553(a), Judge, that the
11 government wants to emphasize is the respect for the law.  As
12 you found beyond a reasonable doubt in your order, the
13 defendant lied numerous times to law enforcement and to
14 Motorola, and pretty much those lies, high volume of lies
15 between February 20th and February 29th of 2007.  But most
16 importantly, your Honor, is when she was caught redhanded, she
17 lied.  She lied about the money she was carrying.  She lied
18 about the reason that she had those Motorola documents.

19        In the defense filing, they say as part of their
20 acceptance argument and mitigating factor that she just never
21 contested that she had these documents through inappropriate
22 means.  However, the defense stands here even today and says
23 that they could have got them -- that she could have got them
24 remotely while she was still employed for Motorola.

25        That's simply not the case.  There is forensics in

1　this case, and she took all those documents in a matter of two

2　days after lying to Motorola three or four times.

3　　　　　And as far as other respect for the law issues here,

4　Judge, I think it is significant that among the events that

5　I've already talked about that took place between

6　February 20th and when she was arrested or stopped at the

7　airport, one of those things is, Judge, she comes back to the

8　United States to be naturalized.  She raised her hand in front

9　of a federal judge and says that she doesn't have any

10　connections or ties or affinity for a foreign government.  And

11　at that time when she's making, taking that oath, she knows

12　that back home, she's got classified Chinese military

13　documents and she's also going back to the PRC, to China, with

14　a career goal and the hope of getting a good salary from Sun

15　Kaisens, which clearly their only -- their purpose, as you saw

16　it in the exhibits that were admitted at trial, was to further

17　the Chinese military.  That was their goal.

18　　　　　And lastly, Judge, but certainly not of least

19　importance is deterrence in this case, and I'll speak to

20　general deterrence.

21　　　　　Judge, the impact that this, the theft of trade

22　secret has on industries like Motorola's where really the

23　value is driven by the fact that it's secret is enormous.  The

24　fact that iDEN has cornered the market on their invention

25　causes its value to go up, and in turn, it creates jobs, 900

1    jobs in 2006.

2              There is a human element to this, but most
3    importantly, Judge, these are easy crimes to commit.  Look at
4    the defendant.  She had been at Motorola for nine years.  She
5    was trusted.  Because she was trusted, they gave her access to
6    trade secrets because they wanted to make more money, and
7    they're not going to make money by keeping it on a shelf under
8    lock and key.  They've got to have these trade secrets given
9    to smart people who can come up with new ideas to improve on
10   what's already good.

11             And that's what happened in this case.  But look at
12   how easy it was in a way for her to do.  She just lied.  She
13   took advantage of her nine years of great employment where she
14   got great reviews, salaries where she went up from $40,000 to
15   $90,000, and she comes in and steals thousands of documents
16   and tries to board a plane for China.

17             So while Motorola's got the problem of how do they go
18   forward?  They have a trusted employee that they gave access
19   to because they want to make money, and that employee
20   ultimately stole from them.  She was disloyal.  And, Judge,
21   looking at general deterrence, other companies are going to
22   have the same problem, and it's going to have an impact on
23   American industry if a defendant such as Ms. Jin can take this
24   risk, come in, in two days take a thousand documents and hope
25   to board a plane to China, which it does have value.  She can

1   sell it to whoever she wants at that point.  There's no legal
2   remedy that Motorola is effectively going to take to get those
3   documents back, Judge.

4          But at that point, they've already lost.  They've
5   lost their trade secrets.  They've lost the technology.

6          So, your Honor, there's that issue of the fact that
7   she now is asking for probation, so she basically rolled the
8   dice to see if she could get millions of dollars of research
9   and take it to China, and now she gets caught, goes to trial
10  and ultimately comes before your Honor and asks for a sentence
11  of probation.  That would not, I don't think, generally deter
12  others who are in the same position who are sitting at their
13  desk with trade secrets to forgo the opportunity to make
14  illicit gains through selling those trade secrets to a
15  competitor.

16         And lastly, your Honor, as far as general
17  deterrences, there's an issue about these cases coming forward
18  from industry, is that, you know, if a defendant does go to
19  trial or contest these trade secret issues, there's a risk to
20  Motorola and other people in various industries about trying
21  to put their trade secrets forward to effectively seek justice
22  in these cases.

23         A defendant such as Ms. Jin who can test the
24  government, the government with the Court's permission was
25  able to keep that, and the defense's agreement was able to

1    keep those trade secrets confidential, your Honor, but that's

2    a big issue when people are considering, companies and

3    industry are considering whether to go forward on these cases.

4         And, Judge, a probationary sentence does not send the

5    message that these are serious crimes recognized by federal

6    courts as being serious with serious penalties.  Instead, your

7    Honor, the sentence that's appropriate in this case is 70 to

8    96 months of imprisonment; and that, your Honor, for those

9    reasons and the reasons in our brief is why we're seeking a

10   sentence of imprisonment of 70 to 96 months.

11        Thank you.

12        THE COURT:  Thank you.

13        Mr. Murphy.

14        MR. MURPHY:  Thanks, Judge.

15        Judge, I don't want to -- we spent a lot of time

16   talking about money and -- and value and loss, and I don't

17   want to spend a lot of time, but I know the Court has read our

18   filings and the chart that we put forward --

19        THE COURT:  Right.

20        MR. MURPHY:  -- discussing all the various 1832 cases

21   that have been prosecuted in this country.  And the volume and

22   value that the government is putting forth here doesn't trump

23   the real harm or the aggravated harm that occurred in these

24   other cases that the Court saw and did not occur in this case.

25   There is -- it is beyond dispute from anybody that there was

1  no actual harm to anyone in this particular case.

2  In the cases that the Court saw that received

3  sentences, and sometimes the sentences were quite low,

4  sometimes they were probation, the harm was -- was clear and

5  direct and -- and the evidence towards that was much different

6  than what -- and much more aggravated than what has occurred

7  in this case.

8  One of the factors the Court obviously knows it has

9  to keep in mind is avoiding unwarranted disparities, and the

10  sentence that the government requests in a factual situation

11  like Ms. Jin's comparative to the other cases would create

12  that kind of unwarranted disparity, and, in fact, the sentence

13  that we have proposed, the probationary sentence, is much more

14  consistent with those facts in those other cases and those

15  sentences.

16  And so for that reason, we think it's appropriate to

17  give the probationary sentence and certainly inappropriate for

18  the government's sentencing request.

19  THE COURT:  Without violating her privacy rights,

20  would you agree that her medical prognosis is fairly good?

21  MR. MURPHY:  I would agree that it is better, yes.  I

22  mean, she -- there was a moment just several months ago where

23  there was some concern of a potential relapse.

24  While they're not a hundred percent sure that she's

25  out of the woods, they're a little more comfortable now, and

1   they're -- she does have another appointment in early October
2   with her oncologist to sort of hopefully --

3           THE COURT:  Okay.

4           MR. MURPHY:  -- carry that through, but that is
5   correct, Judge.

6           The problem with the government talking about the
7   human factor is it sort of ignored one human factor here, and
8   that's Ms. Jin's human factor.  There's no question that
9   Ms. Jin did something illegal, wrong.  She understands that
10  she's to be punished for it.  The question always at this
11  point is how much is enough?  What's the right thing to do?
12  That's ultimately what the guidelines, what 3553(a) are
13  getting at.

14          I don't want to rehash all the issues that we've
15  raised, but I think what the Court can see is that prior to
16  February of 2007, Ms. Jin had led a fairly remarkable life.
17  She had come from rural China in very difficult financial
18  circumstances, the only daughter in the family, went to --
19  excelled academically.  Went to great schools and came to the
20  United States and furthered her education.

21          She was a valued employee because she was a good
22  employee.  The fact of the matter is those facts are the
23  reality of Ms. Jin, and the moments that the government
24  highlights really are, while they are a reality of her and the
25  Court can't ignore them, they are the minuscule portion of her

1   life.

2           Since the time that the Court -- since the time that
3   she was arrested, Ms. Jin again has shown over and over again
4   that she can be relied on, that she can be trusted, that she
5   is a law-abiding individual and will continue to be.

6           She has overcome tremendous personal odds, physical
7   odds.  The Court knows in great detail the physical problems
8   she had in the midst of all of this and, again, we believe
9   that what occurred in 2007 was -- was sort of related --
10  wasn't sort of -- was related to the fact that she had come
11  out of this really near-death experience with the meningitis
12  and the tuberculosis, and she overcame that and then she's
13  overcome the cancer.  The character reference letters that
14  we've provided speak to the fact that she is a kind and caring
15  and trustworthy and decent and reliable person.

16          What's really significant about Ms. Jin, what
17  separates her situation, I think, are the collateral
18  consequences that we've highlighted that make her different
19  than many, many people and justify, we believe, the sentence
20  we ask for.

21          THE COURT:  Like you talk about the collateral
22  consequences of what could occur in China, and you were good
23  enough to provide the recent changes in China's laws, but the
24  only way she would end up in China is voluntarily, right?  She
25  is a naturalized citizen.

1    MR. MURPHY:  That's correct.  And so the choice --
2    and the collateral consequences, though, as I hope we tried to
3    emphasize, is that her family is there.  Her mother, who is
4    sickly, is there.  Her brother and her family is there.  Her
5    husband is there.  She can't -- will not be able, because of
6    that, to go back.

7    You are correct, that's a voluntary choice, but she
8    can't get back there to be with her family, and that is a
9    collateral consequence of her actions and this prosecution.

10   She -- she also, I think significantly, Judge, is
11   prevented from ever working in the field for which she is
12   trained.  And, you know, she has, as we laid out, after she
13   was arrested, she did get two separate jobs doing software
14   engineering that she held for, you know, roughly a month until
15   her employees found out about this, and I'm not faulting those
16   employees, but she was fired.

17   That's proof that she will never be able to
18   participate in the -- in the practice of software engineering
19   for which she's quite good and for which she is trained.

20   Her circumstances, therefore, are drastically
21   diminished.  She is now a caretaker.  She's getting just
22   barely above minimum wage.  It's some time part time.  She has
23   to rent a room from a friend.  Her financial circumstances are
24   terrible, and there's no real prospect of it ever getting
25   better for her.

1          These are the collateral consequences that she is

2    suffering from, not to mention her health conditions which

3    continue to be frail, though better, and the fact that she is

4    forever cut off from her family because of this.  These are

5    significant facts.  These aren't small facts.

6          And in light of all of that, in light of the fact

7    that there was no actual damage, in light of the case law that

8    shows that these cases are -- that Ms. Jin's actions are --

9    are certainly less aggravated than people getting far less

10   serious punishments than the government has recommended, those

11   reasons all justify the sentence of probation that we've

12   requested.

13          THE COURT:  Thank you.

14          Ms. Jin, you can make whatever statement you wish.  I

15   have carefully read your statement to the Court.

16          THE DEFENDANT:  Your Honor, you have read my letter.

17   I want to let you know that I meant every word in that letter.

18   I'm so sorry for what have happened.  It will never happen

19   again.

20          I plead for another chance so that I can add some

21   value to our society after this.  I sincerely plead your mercy

22   on the sentence.

23          Thank you.

24          THE COURT:  Well, Ms. Jin, it is my obligation to

25   sentence you to a sufficient but no greater than necessary

1   sentence.

2   I will say this. You are an enigma to the Court.

3 You're soft spoken. You seem not dangerous. Certainly not

4 the typical federal defendant that I see before me day in, day

5 out. Certainly you're the first person with a Master's degree

6 in physics from the University of Notre Dame that I've ever

7 sentenced, and it's a sad day.

8   I see your life right now having three chapters. The

9 first chapter is a very great chapter. It is a chapter that

10 is repeated day in, day out in the United States. That is, a

11 chapter of someone immigrating to the United States,

12 naturalizing, contributing, becoming part of the economic work

13 force, just a total American success story.

14   That's a great chapter that you could come here and

15 get the education that you did, do as well as you did. I've

16 read very carefully your evaluations at Motorola, and it's

17 very clear that you were a valued, smart employee.

18   But the chapter that I have to deal with is the

19 second chapter, and that's a chapter that is totally

20 disappointing to I think most people that have heard about

21 this case. That is a chapter of a person who, after quitting

22 Motorola, decides to purposely come back to this country when

23 you could have easily gone to China with all that you

24 accomplished in the first chapter and just gone on with the

25 rest of your life back in the country that you were born in,

1  but instead you come on a very purposeful raid, and that's all
2  I can call it.  It is a raid in no uncertain terms.  It is a
3  raid to steal technology.  It is a very carefully designed
4  raid, where you come back and pretend to rejoin Motorola and
5  then very purposely seek out certain documents from Motorola
6  that you knew were covered by their trade secret protections
7  that were not easy to obtain, that you wanted to be sure that
8  you obtained, so much so that by my calculations you pulled
9  down not only one copy but two copies, sometimes as many as
10  three or four copies of the same documents, which to me
11  signals that you wanted to make sure that you got these
12  documents.

13          And you conducted this raid in the dead of night, in
14  the after hours when you knew there was a lesser chance that
15  you would be caught, and it certainly worked out very
16  successfully because I will forever recall watching the
17  videotape of the Motorola security people holding the door
18  open for you as you walked out with shopping bags full of
19  confidential documents.  They did that because they were
20  treating you as an employee, which you falsely represented
21  that you wanted to come back.

22          And so I don't for one minute buy the story that you
23  had any intent to rejoin the Motorola workforce, not the way
24  that this raid went down.

25          Now, once you leave with these documents, you have a

1   plane ticket to go out of the country.  You also happen to be

2   carrying Chinese top secret documents, which I will talk about

3   in a second.

4   　　　　Now, what happens with regard to the second chapter,

5   which would have been a successful raid, is I fully credit the

6   United States Customs Service with stopping you and

7   questioning you in a proper way, which was probably the

8   epitome of good law enforcement work which led to your arrest

9   and the recovery of all these documents.  So that the loss

10  that could have occurred, that maybe was destined to occur was

11  prevented.

12  　　　　But it was prevented by good law enforcement work.

13  It wasn't prevented by any action on your part, and this Court

14  already carefully concluded that you did your best to lie to

15  the Customs officials and to try and talk your way out of it,

16  but it wasn't an offense that you could talk your way out of.

17  You were caught pretty much redhanded.

18  　　　　Looking at all the factors of this offense, I think

19  it would seriously deprecate this offense to sentence you to

20  the sought-after sentence of probation.  That, to me, is just

21  not an appropriate way to deal with this offense and certainly

22  not a way to deal with this offense in 2012 because in today's

23  world, the most valuable thing that anyone has is technology.

24  　　　　This is a technical world that we live in.  Everyone

25  in this courtroom is carrying around technology of one kind or

1    another that I think it would be fair to say we never expected

2    to have.  No one expected to live in this world that we now

3    live in; but such -- it is what it is, and the most important

4    thing that this country can do is protect its trade secrets.

5    And that, I think, is why this law exists, and you have

6    certainly violated that law on three different occasions, each

7    subjecting you to ten years' imprisonment.

8         Now, I would be the first one to conclude that even

9    though I made my best reasonable estimate of the loss in this

10   case, with regard to the specific facts before the Court,

11   which were tried very carefully and very well by both sides in

12   this case, and that advocacy has not been lost today at

13   sentencing, I would still conclude under the sentencing

14   guidelines that the loss in this case, which I estimate to be

15   an intended loss of anywhere from 10 to $15 million, seriously

16   overstates this particular offense, given the fact that an

17   actual loss did not occur.

18        Nevertheless, I need to consider not only specific

19   deterrence but general deterrence, and I think in today's

20   world, general deterrence is going to be very important in

21   terms of protecting trade secrets so that everyone needs to

22   know that this is a serious offense and will be treated very

23   seriously.

24        Now, I've carefully weighed the individual factors,

25   which I think in this case cut in all kinds of different

1  directions.  One, Ms. Jin is well educated, was financially as
2  well positioned as anyone I have ever seen but for the one
3  percent of the elite.  But she was living in a house that had
4  a mortgage that was paid for.

5  She had a six-figure bank account.  I would think
6  it's very plain that most Americans would love to live in that
7  situation and unfortunately do not.  So there was no economic
8  need on her part at all to commit this offense, nor would
9  economic need ever justify the stealing of technology from any
10  company.

11  So the individual facts that I do think cut more in
12  her favor are, number one, her undisputed medical condition as
13  a cancer survivor, which even though the prognosis is good,
14  with that particular sickness, you never know how the stages
15  might be in the future.

16  Number two, the collateral consequences that
17  Mr. Murphy referenced today in terms of having a husband in
18  China and, more importantly, having a sick mother in China are
19  not favorable to Ms. Jin, since she is a naturalized citizen.

20  Now, finally, let me address these classified Chinese
21  documents.  The fact is, Ms. Jin, that the government asked me
22  to find that you betrayed Motorola, and I do find beyond a
23  reasonable doubt and I will sentence you today for betraying
24  Motorola.

25  As to the betrayal of your new naturalized country, I

1  could not find in good conscience beyond a reasonable doubt
2  that you did that, but can I find by putting the evidence on a
3  set of scales such as I have to the right that it is more
4  probably true than not true that you did that?  I do,
5  unfortunately, reach that conclusion, that you were willing to
6  betray your naturalized country, and that is an unfortunate
7  conclusion.

8         So reaching and carefully evaluating all of these
9  factors, in light of your sickness, I will sentence you to the
10  custody of the Bureau of Prisons for a period of 48 months.
11  That's what I think is a sufficient but no greater than
12  necessary sentence.

13         I will say for the record that if it weren't for your
14  medical condition, your sentence would have been higher, but I
15  think that is a sufficient sentence that will deter others and
16  will deter you.

17         Ultimately, it will be up to you.  I referenced the
18  third chapter.  That is the chapter that the rest of your life
19  will be once you serve that sentence.  That chapter you're
20  free to write and hopefully make a decent contribution to this
21  society, given your education; but for now, I'm just dealing
22  with the second chapter, and that chapter requires me to
23  sentence you to a four-year sentence to be followed by three
24  years of supervised release, one year concurrent -- or one
25  year consecutive on each count.

1    I'm going to fine you $20,000.

2    I'm going to assess you $100 per count for a total

3    assessment of $300.

4    While you're on supervised release, you shall adhere

5    to the standard conditions, as well as you shall start

6    repayment of any amount of this money that hasn't been paid on

7    equal monthly installments over the course of your three years

8    of supervised release; but the fine of $20,000, since to a

9    certain extent this offense was motivated by your desire to

10   obtain permanent employment by Sun Kaisens in China, that's

11   why I'm fining you, that will be due and payable immediately.

12   And so hopefully that will be done, and you won't have to

13   worry about equal monthly payments.

14   I will let you self-surrender.  We do have possession

15   of Ms. Jin's passport?

16   MR. DOLLEAR:  That's correct, your Honor.

17   THE COURT:  Okay.  Do you want me to recommend any

18   particular institution?

19   MR. MURPHY:  Judge, I would ask for an institution

20   that's a medical facility for women as a precaution for any

21   potential health problems that might -- might occur.

22   THE COURT:  Okay.  So I will recommend the most

23   appropriate institution in the Midwest area that can attend to

24   Ms. Jin's medical conditions.

25   Anything else we need to take care of?

1        MR. McLAUGHLIN:  Your Honor, with respect to the

2   reporting date, could we set it approximately eight weeks out

3   at least so that Ms. Jin can make her medical appointments in

4   early October and they can come up with whatever transition

5   plan is necessary?

6        THE COURT:  Okay.  We'll set it eight weeks, so that

7   will be --

8        THE CLERK:  How about October 25th.

9        THE COURT:  Okay.

10       MR. McLAUGHLIN:  And, your Honor, can the order state

11  that the costs of incarceration are waived as to Ms. Jin?

12       THE COURT:  It will be waived in deference to the

13  fine.

14       Finally, I'm going to specify that if that fine and

15  assessment have not been paid, they should be paid at least

16  equal to 10 percent of her net monthly income over the course

17  of the three years of supervised release.

18       Mr. McKechnie, is there anything I missed?

19       PROBATION OFFICER:  No, your Honor, but just for

20  clarification, oftentimes the Bureau of Prisons may request

21  the medical records that we have.

22       THE COURT:  Okay.

23       PROBATION OFFICER:  And with your permission and

24  Ms. Jin's permission, I'd like to transfer those to the Bureau

25  of Prisons.

1        THE COURT:  Okay.

2        MR. MURPHY:  No objection to that, Judge.

3        THE COURT:  Okay.  That's granted.  So we will

4    provide that in the record.

5        And anything else?

6        PROBATION OFFICER:  No, your Honor.

7        THE COURT:  And I wish to expressly thank you,

8    Mr. McKechnie, for your fine report in this case.

9        MR. DOLLAR:  And, Judge, just for the record, as far

10   as the fine, there is a $30,000 cash bond, so we'll probably

11   come in and file something with respect to that.

12       THE COURT:  Okay.

13       MR. DOLLAR:  And the government has a final order of

14   forfeiture motion and order.  You've already entered the

15   preliminary order as agreed.  I presume this one is agreed,

16   but in fairness, I just handed it to Mr. Murphy.

17       Could I hand that up?

18       THE COURT:  I will not execute it until I get word

19   from you that it's acceptable by the end of the day.

20       MR. MURPHY:  Thank you.

21       THE COURT:  Thank you.

22       MR. DOLLAR:  Thank you very much.

23       MR. MURPHY:  One last thing.  I think Ms. Jin needs

24   her right to appeal.

25       THE COURT:  Sure, absolutely.

1    Ms. Jin, you have a right to appeal both this
2    sentence, as well as the verdict rendered by this Court.  You
3    can do so by filing a notice of appeal within ten days.  If
4    you need court-appointed counsel, you can request one from the
5    Court of Appeals.
6        We'll stand in recess.
7        MR. DOLLEAR:  Thank you.
8        (Which were all the proceedings heard.)
9                        CERTIFICATE
10    I certify that the foregoing is a correct transcript from
11    the record of proceedings in the above-entitled matter.
12    */s/Kathleen M. Fennell*                *September 13, 2012*
13    _____    _____
14    Kathleen M. Fennell                   Date
      Official Court Reporter
15
16
17
18
19
20
21
22
23
24
25